IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ERNIE NMI FREEMAN;                    )

    PLAINTIFF,                        )

VS.                                   )        CV99-H-1276-S

MG BROADCASTING OF BIRMINGHAM,        )
INC., corporation d/b/a
WIAT-TV; and ERIC S. LAND,            )
an individual,
                                      )
    DEFENDANTS.

**ENTERED**

**DEC - 1 2000**

### MEMORANDUM OF DECISION

The court has before it the September 6, 2000 motion of

defendants MG Broadcasting of Birmingham, Inc. and Eric S. Land

for summary judgment in their favor with regard to the claim of

Ernie Freeman against them for fraud under Count Five and the

September 6, 2000 motion of MG Broadcasting for summary judgment

in its favor with regard to the claim of Ernie Freeman against it

for breach of contract under Count Four.[1]  Pursuant to "ORDER

NUMBER THREE" entered September 18, 2000 (Document Number 97),

---

[1] Other than the claims described above, the only remaining
claims by Ernie Freeman in this action are against MG
Broadcasting under Title VII (Count One) and Section 1981 (Count
Two).  Those claims, while addressed by the September 6, 2000
motion for summary judgment, have not been the subject of any
submission order.  See the September 25, 2000 order (Document
Number 100).

the motion for summary judgment as to such claims is now under submission. The parties have presented to the court evidence in support of and in opposition to the motion, as well as briefs addressing the issues now under submission.[2]

## I.  Procedural History

Plaintiff Freeman and six other plaintiffs commenced this action May 20, 1999 asserting a variety of claims against MG Broadcasting, Land, and Media General, Inc. Media General was dismissed with prejudice by the November 2, 2000 order (Document Number 115). Conversion and defamation claims (Counts Seven and Eight respectively) by two of the plaintiffs were dismissed September 11, 2000 (Document Number 92). Following extended discovery the remaining two defendants filed motions for summary judgment on September 6, 2000 with regard to all remaining claims asserted by the plaintiffs. Those motions, as they addressed some of the claims, were the subject of "Order Number One" and "Order Number Two," both being submission orders entered September 18, 2000 (Document Numbers 95 and 96), but those claims became moot with the dismissal of Media General as a party

---

[2]  Such evidentiary submissions and briefs also were submitted in connection with the claims of Freeman under Counts One and Two, which are not under submission at this time.

2

defendant on November 2, 2000.  A third order of submission,
Order Number Three, also entered September 18, 2000 (Document
Number 97), is the submission order which is applicable to the
claims which are the subject of this memorandum of decision.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary
judgment is proper "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to judgment
as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986).  The party asking for summary judgment always bears the
initial responsibility of informing the court of the basis for
its motion and identifying those portions of the pleadings or
filings which it believes demonstrate the absence of a genuine
issue of material fact.  Id. at 323.  Once the moving party has
met his burden, Rule 56(e) requires the nonmoving party to go
beyond the pleadings and by his own affidavits, or by the
depositions, answers to interrogatories, and admissions of file,
designate specific facts showing that there is a genuine issue
for trial.  Id. at 324.

3

The substantive law will identify which facts are material and which are irrelevant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>Id.</u> at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991)(<u>en banc</u>)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the

4

burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record

5

evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts

MG Broadcasting of Birmingham, Inc. acquired the assets of WBMG-TV on January 7, 1997, as an indirect wholly-owned subsidiary of Media General, Inc. (Land Decl. ¶ 2). WBMG-TV later became WIAT-TV ("WIAT"). (<u>Id.</u>). WBMG-TV/WIAT is a CBS affiliate in the Birmingham/Tuscaloosa/Anniston market. Eric Land has been President and General Manager of WBMG-TV/WIAT since March 25, 1997. In this capacity, he manages the day-to-day operation of the station. (<u>Id.</u> ¶ 1; Land dep. 429).

In 1997, WBMG-TV was in last place among the four major network affiliated television stations in the local news market (WIAT Ans. To Interrog. #14; Land dep. 95-96) and undertook an effort to reformat its news programs, with the assistance of a consultant company, in order to improve its ratings. (WIAT Ans.

6

To Interrog. #14).  In this effort, Media General and local management in Birmingham adopted (in late November 1997) and implemented a plan to remake the station's news operation, including (1) shutting down the station's news programming in January 1998 in order to enact the changes; (2) relaunching the entire station with the new call letters WIAT-TV, a new set, new graphics, etc. on February 5, 1998; and (3) relaunching the news program in a new "News for Busy People" format, under which only anchors (not reporters) would be seen on air and short news segments would be provided.  (Id.).  Since the relaunch, WIAT's ratings, revenue, and market share have increased; it has received industry awards as well as positive public feedback. (Land dep. 97-98, 132, 137-39, 142).

Prior to employment with WIAT, plaintiff worked as a reporter for an Atlanta television station; his contract with that station was not being renewed.  (Pl. dep., Vol. I, 386, 388).  In seeking employment with WIAT, plaintiff responded to a job posting entitled "Weekend Anchor" which stated that WBMG-TV "needs weekend anchor with proven ability as a communicator and storyteller."  It offered the opportunity to "join a growing news operation launching a fresh, new approach to television news" and

required a minimum of three years reporting/anchoring experience. (<u>See</u> Excerpts from Pl.'s Personnel File at D00036).

On February 2, 1998, plaintiff entered an employment contract with WIAT.  (<u>See</u> Land dep. 157; Pl. dep., Vol. II, 82, 84-85; Employment Contract, Def. Exh. 9).  The contract stated that plaintiff would serve as a "full-time staff news person and artistic professional," and his starting salary was $62,000. (<u>Id.</u>).  Plaintiff was represented by an agent when he negotiated and executed this contract.  (Pl. dep., Vol. I, 220, 270, 282-84).  The contract referenced the company's policies and procedures manual and included a merger clause.  (<u>See</u> Def. Exh. 9).  It also provided that "the scope of [plaintiff's] duties [was] entirely within the discretion of [WIAT] and may be changed by [WIAT] at any time."  (<u>Id.</u>).

During his employment with WIAT, plaintiff served as a weekend news anchor on weekend news programs and as an off-camera reporter on some weekdays.  (Land dep. 157, 160).  He initially served as the only weekend news anchor until Lily Jang, an Asian American, was hired as a co-anchor several months later.  (Pl. dep., Vol. I, 56, 68; Land dep. 160, 161).  Plaintiff always understood that the station planned to hire a co-anchor.  (Pl. dep. 68).  Under the new format, one of the news co-anchors was

sitting, and the other was standing, according to the design of the set. (Land dep. 162, 174-75; Pl. dep., Vol. I, 69). News Director Micah Johnson temporarily alternated plaintiff and Jang between the standing and sitting positions in order to determine the best set-up. (Pl. dep., Vol. I, 68-69; Johnson decl. ¶ 67). The rotation in position had no affect on plaintiff's salary or title, and there was no preferred anchor position; the positions were that of co-anchors (Land decl. ¶ 14; Land dep. 164-67, 174-75).

In August of 1998, Johnson left the station, at which time the interim News Director, Mark Toney, decided to freeze the rotation until a permanent news director was hired; at this time, plaintiff was the standing anchor, and Jang was the seated anchor. (Land decl. ¶ 13). Plaintiff claims that on September 6, 1998, Ken Pilcher, Executive Producer, notified him that he would be in the standing position and Jang would be sitting. (Pl. dep., Vol. II, 202).[3]

When plaintiff began work at WIAT, he worked Sunday through Wednesday and was off on Thursday and Friday. (Pl. dep., Vol. I,

---

[3] Plaintiff claims that the sitting anchor handled a larger number of stories than the standing anchor. (Pl. dep., Vol. I, 68-69).

9

44; Johnson decl. ¶ 65). For several months, Johnson temporarily changed plaintiff's off days to Monday and Tuesday, believing that was the best arrangement for the station at that time, and informed plaintiff that the change was temporary until a second weekend anchor was hired. (Johnson decl. ¶¶ 65, 66). During this time, plaintiff's pay and his total number of hours worked per week remained the same. (Johnson decl. ¶ 65). When Jang was hired, Johnson returned Freeman's schedule to Thursdays and Fridays off, as plaintiff preferred. (Pl. dep., Vol. I, 37-38, 44, 50, 64; Johnson decl. ¶ 65).

On August 12, 1998, plaintiff executed a relocation agreement indicating that he had accepted employment as a weekend anchor. This agreement did not reference the position of "feature reporter." (Pl. dep., Vol. II, 283-84; Def. Exh. 27).

While employed with WIAT, plaintiff talked with Gilbert Nicholson, a reporter for the Birmingham Business Journal, on three or four occasions about the station. (Pl. dep., Vol. I, 354). He understood that Nicholson was going to write a story using the information provided to him by plaintiff. (Id. 367). During these conversations, the two discussed the atmosphere at the station, and plaintiff made charges of racial discrimination against the station, told Nicholson that the station's managers

10

deceived him about being a featured reporter, and was critical of

the station's new format. (Pl. dep., Vol. I, 363; Pl. dep. Vol.

II, 151, 154, 158-59, 190-91, 197-200).[4]   Nicholson came to

Land's office regarding plaintiff's claims and reported that

plaintiff had requested that his name be used in conjunction with

the story.   Land then offered his own comments which were

included in the publication. (Land dep. 458-60). On September

28, 1998 and October 5, 1998, the Birmingham Business Journal

published articles about WIAT which contained numerous quotes and

comments by plaintiff about the station and its management.

(Land decl. ¶ 26; Pl. dep., Vol. I, 377 & Vol. II, 288; Def.

Exhs. 1 & 29 (articles)).

Plaintiff was aware of the terms of his contract when he was

discussing the station with Nicholson. (Pl. dep., Vol. II, 248).

Plaintiff's contract provided that he could be terminated for

cause under certain circumstances, including "commit[ting] any

act or becom[ing] involved in any situation or occurrence . . .

---

[4] In addition, plaintiff may have said or done the
following: (1) suggested people Nicholson might call at the
station to further his story; (Pl. dep., Vol. I, 368); (2) told
Nicholson about an anonymous racial slur passed around the
Station's e-mail during the weekend of September 19 (Id. at 409);
(3) told Nicholson that 98% of the news room employees "wanted
out" (Id., Vol. II, at 149).

11

which may reflect unfavorably upon plaintiff or [the Station] . .
. ." (See Def. Exh. 9, Employment Contract, Section VIII,(a)).

Prior to the publication of the articles, plaintiff had met
with Land and had sent a letter to the station alleging several
issues, including discrimination and unfair treatment.  Media
General Broadcast Group Vice President Rick Roberts investigated
the allegations and found no discrimination relating to
plaintiff.  At the end of the investigation, Roberts attempted to
call plaintiff but was unable to contact him via phone or page.
(Land dep. 458-60).

Land and Roberts decided to terminate plaintiff for
violating his employment agreement by making the statements
appearing in the two consecutive editions of the Birmingham
Business Journal.  Land and Roberts were unable to contact or
locate plaintiff, so they had a letter hand delivered on
September 25, 1998 notifying plaintiff of his termination.  (Land
decl. ¶ 27; Roberts decl. ¶ 9; see Def. Exh. 9, Employment
Contract, Section VIII(a)).  Plaintiff's termination was
effective on September 26, 1998.  (Ellenburg decl. ¶ 10).

12

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint contains the following claims now under consideration: (1) fraud (Count Five) and (2) breach of contract (Count Four). Defendants' motion for summary judgment asserts that plaintiff (1) has not alleged and cannot prove the elements of fraud; (2) could not have reasonably relied upon any contrary oral statements made prior to the execution of his employment agreement; (3) has failed to provide facts to indicate what terms or provisions of his contract were violated by his termination; (4) was assigned duties which complied with the language of the contract; (5) has failed to comply with the terms of his employment contract; and (6) has failed to allege damages as a result of receiving no performance evaluations. The Court will address plaintiff's claims separately.

### A. Fraud Claims

Plaintiff claims fraud in the inducement of his employment contract. Plaintiff alleges that when he was hired, he was promised the positions of "featured reporter" and weekend news anchor by Eric Land and that he did not receive the reporter position because, unknown to him, WIAT had no "feature reporters." (Pl. Br. 15). He contends that the job posting to which he responded and a February 3, 1998 Job Posting Requisition

13

for his position support the claim that he was hired as a
reporter, as well as testimony by Susan Ellenburg, Human
Resources Coordinator and Executive Assistant to Land, that
plaintiff was hired as a weekend anchor/reporter and that WIAT
had no featured reporters at the time of plaintiff's hire.  (See
Ellenburg dep. 10, 28, 34).  Plaintiff contends that Land's
representation that plaintiff would be a "feature reporter," when
Land knew at that time there were no feature reporters at WIAT,
demonstrates a lack of present intent to perform.  Plaintiff
further maintains that plaintiff's reliance on Land's
representation was reasonable as his statement was not obviously
false on its face, and he had authority to make the statement at
issue. (Pl. Br. 16).

Defendants contends that plaintiff has failed to allege
sufficient facts to support the elements of a fraud claim.
Specifically, defendants contends that plaintiff (1) has failed
to allege any fact that constitutes a material misrepresentation
by defendants; (2) could not have reasonably relied on anything
contrary to his February 1998 employment contract; and (3) has
demonstrated no evidence of defendant Land's intent to deceive.
(Def. Br. 49-50).

14

In order to establish a prima facie case of fraud, the plaintiff must prove the following four elements: (1) that defendant made a false statement regarding a material fact to the plaintiff; (2) that defendant made the misrepresentation willfully, with the intent to deceive the plaintiff;[5] (3) that plaintiff reasonably relied on the misrepresentation; and (4) that plaintiff suffered some damage or injury as a proximate result of his reliance on the misrepresentation.   See Hughes v. Hertz Corp., 670 So.2d 882, 885 (Ala. 1995).   Plaintiff has alleged fraud based on (1) the "feature reporter" position and (2) performance evaluations.   The Court finds that plaintiff has failed to establish a prima facie case of fraud on either claim.

First, at the time plaintiff accepted employment with defendant, any representation that plaintiff would be a feature reporter would be a promise about what defendant might do in the

---

[5] Under Alabama law, "fraud" can also be a misrepresentation of an *existing* fact made recklessly, negligently, or innocently. See Hughes, 670 So. 2d 882 at 888. However, "where the representation relates to some future event, it must be shown that the person making the misrepresentation intended not to do the act promised at the time the misrepresentation was made," i.e., with an intent to deceive or with present intent not to perform.   See Russellville Prod. Credit Assoc. v. Frost, 484 So. 2d 1084, 1087 (Ala. 1986) (citing Kennedy Electric Co. v. Moore-Handley, Inc., 437 So. 2d 76 (Ala. 1983)).

15

future.[6]  Plaintiff has not provided substantial evidence that

defendant knew the statements at issue were false and intended to

deceive plaintiff.  Plaintiff merely contends that because WAIT

had no feature reporters at the time he was hired, Land's

statement that plaintiff would be a feature reporter showed no

present intent to perform his promise.  (Pl. Br. 16).

Second, plaintiff has failed to demonstrate that he

reasonably relied on the alleged misrepresentations.  Reliance

requires plaintiff to prove that his belief in the fact

misrepresented by the defendant caused him to take some specific

action or refrain from taking some specific action; that

plaintiff would have acted differently had he known the truth.

Such reliance must be reasonable:  whether an ordinarily prudent

person, situated similarly to plaintiff, and exercising due care,

would have relied on the misrepresentation under all of the

surrounding circumstances.  See Foremost Ins. Co. v. Parham, 693

So. 2d 409 (Ala. 1997) (citing Torres v. State Farm Fire &

Casualty Co., 438 So. 2d 757 (Ala. 1983)).  In addition, under

---

[6] Similarly, putting aside the issue of whether the policies
and procedures manual constituted (part of) the employment
contract, any statement contained therein regarding performance
evaluations would also be considered a promise to do something in
the future, and thus not an existing fact at the time plaintiff
accepted employment with defendant.

16

the law, a person who signs a contract is under a duty to read

the contents of that contract and is bound to the terms of the

contract, regardless of whether he reads the contract.  Locklear

Dodge City, Inc. v. Kimbrell, 703 So. 2d 303, 306 (Ala. 1997).

Plaintiff had experience in the television industry and was also

represented by an agent in negotiating and executing the contract

with defendants.  He signed a contract of employment which (1)

made no reference to a "feature reporter" position; (2) made

plaintiff's duties subject to defendant's discretion and subject

to change by defendant at any time (Def. Exh. 9, ¶ 1, p.1); (3)

contained a clear and unambiguous merger clause evidencing the

parties' intention that the writing serve as a complete

integration of their agreement[7]: "[t]he Agreement contains the

entire understanding of the parties" and "there are no agreements

between [the parties] except as set forth in th[e] Agreement"

(Def. Exh. 9 ¶ XX, p. 5); and (4) referenced defendant's policies

and procedures manual which contained provisions stating that

"the contents of this manual do not constitute the terms of a

contract of employment" and further stating that employment with

---

[7] See Moore v. Pennsylvania Castle Energy Corp., 89 F.3d
791, 796-97 (11th Cir. 1996) (holding that whether a contract is
ambiguous and whether a writing is a complete integration of the
parties' agreement are questions of law for the court).

defendant is on an "at-will basis", may be terminated at any time by either party, and any oral statements to the contrary by an agent of defendant are "invalid and should not be relied upon by prospective or existing employees." (WIAT Personnel Policy Manual, Introduction). Given these facts, plaintiff cannot now argue that he <u>reasonably</u> relied on any contrary oral statement made prior to the execution of his employment contract. Any such reliance by plaintiff would not have been reasonable under these circumstances.[8]

Plaintiff is correct that fraud is an exception to the rule that parol evidence of prior or contemporaneous negotiations is inadmissible to vary, alter, or contradict a written instrument that is the complete, final, integrated, and unambiguous agreement of the parties.[9] <u>See</u> <u>Poole v. Henderson, Black & Greene, Inc.</u>, 584 So. 2d 485, 487 (Ala. 1991). However, plaintiff has failed to demonstrate a prima facie case of fraud

---

[8] Likewise, any argument that plaintiff relied to his detriment on defendant's policy regarding performance evaluations in his decision to accept employment with defendant is also unreasonable.

[9] The merger doctrine is very similar to the parol evidence rule. Under this doctrine, in the absence of fraud, a valid written contract mergers all prior and contemporaneous negotiations on the subject. <u>See</u> <u>Haddox v. First Ala. Bank of Montgomery, N.A.</u>, 449 So.2d 1226, 1231 (Ala. 1984).

and thus cannot succeed in this attempt to use prior oral statements to contradict his written employment contract, which controls the rights of the parties in this case. See Poole, 584 So. 2d at 487; see also Intercorp, Inc. v. Pennzoil Co., 877 F.2d 1524, 1530 (11th Cir. 1989) (stating that "fraud or misrepresentation cannot be predicated upon a verbal statement made before the execution of a written contract when a provision in that contract contradicts the verbal statement") (quoting Tyler v. Equitable Life Assur. Soc. of U.S., 512 So. 2d 55 (Ala. 1987)). All oral discussion, negotiations, or agreements prior to the execution of the written contract are merged into the final written employment contract.[10]  See Poole, 584 So. 2d at 487).

For the foregoing reasons, summary judgment is due to be granted as to plaintiff's fraud claims.

---

[10] Plaintiff also offers a February 3, 1998 job posting requisition describing his job as "Anchor, Report, & Edit News Stories." (Excerpts from Pl.'s Personnel File at D00037).  The parol evidence rule does not bar consideration of this evidence, because the requisition was subsequent to the execution of the employment contract.  However, this evidence makes no mention of the "feature reporter" position which plaintiff claims and is unhelpful to plaintiff in his attempt to contradict his written employment contract.

19

## B.  Breach of Contract Claims

Plaintiff alleges breach of contract based upon the same grounds as his fraud claim: an alleged oral promise of a "feature reporter" position.    In addition, plaintiff alleges that he was terminated in violation of his contract (Compl. ¶ 17) and that defendant failed to give him performance evaluations in accordance with station policy.  (Pl. Br. 5-7).  As to damages on this claim, plaintiff alleges that he was demoted to a secondary anchor position and that his duties and schedule were changed. (Id. 7; Compl. ¶¶ 17-18).  Plaintiff claims that his breach of contract claim is not barred by the parol evidence rule because of fraud. (Pl. Br. 3-5).

Again, defendant argues that the clear letter of plaintiff's contract shows that plaintiff's allegations are contrary to his contract agreement; that plaintiff could not have reasonably relied upon any prior, contrary oral statements (Def. Br. 45-46); and that the merger provision in plaintiff's employment contract bars evidence of prior or contemporaneous terms that contradict the clear and unambiguous terms of plaintiff's contract.  As to evaluations, defendant argues that plaintiff can show no damages because he was not demoted and not damaged by a temporary change in schedule or a change in duties.  (Id. 24-25, 30, 48).

20

A breach of contract is defined as a "failure, without legal excuse, to perform any promise which forms the whole or part of a contract." In order to establish a breach of contract, plaintiff "must prove: (1) the existence of a valid contract binding the parties in the action, (2) [plaintiff's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." Mann v. Bank of Tallassee, 694 So. 2d 1375, 1380 (Ala. Civ. App. 1996) (citations omitted).

As previously established, the valid employment contract controls the parties' rights in this case. As with plaintiff's fraud claim, plaintiff cannot attempt to contradict the terms of his employment agreement with allegations of oral statements or negotiations prior to the execution of that contract. The Court can find no breach of the employment contract by defendant.

As to the "feature reporter" allegation, such position was clearly not provided for in the contract. Plaintiff's contract states that he was hired as "a full-time staff news person and artistic professional." (Def. Exh. 9, ¶ 1, p.1). Plaintiff has pointed to no evidence to demonstrate that he was "demoted" when he was assigned the standing anchor position, with no reduction in pay or change in title and no evidence of any tangible, adverse consequence associated with the standing position.

21

Furthermore, plaintiff has pointed to no evidence that he suffered any harm as a result of any scheduling or duty changes, when there was no loss of pay, no change in title, no change in total hours worked per week, no evidence of any materially adverse change in duties, and plaintiff's preferred off-days were restored to him after the temporary schedule change.  Even assuming there were substantial duty changes, plaintiff's written employment contract clearly provides that plaintiff's duties as an employee of WIAT were subject to WIAT's discretion and subject to change at any time.

The evidence shows that plaintiff was terminated for making statements to the Birmingham Business Journal which reflected negatively on the station, criticizing the news format and alleging that management was deceptive and discriminatory. Plaintiff's contract clearly provides that he can be terminated, with twenty-four hours notice, for such conduct.  Plaintiff received the requisite notice in accordance with the contract. Plaintiff cannot establish a breach of contract claim based on his termination.

As to any violation of the station's policies regarding performance evaluations, although the policy manual was expressly incorporated into plaintiff's written contract, the introduction

22

to the manual clearly states that the contents of the manual do
not constitute a contract of employment. Plaintiff executed a
written acknowledgment that he had read and fully understood the
policy manual. (Def. Exh. 14). It is undisputed that
plaintiff's employment with defendant ended prior to the date
upon which he would have been due to receive an annual merit
review. Plaintiff did not receive the forty-five and ninety day
reviews provided for in the policy manual; however, because the
manual by its terms is not a contract of employment, plaintiff
cannot establish a breach of contract claim on this basis.
Furthermore, plaintiff has not shown that he was damaged in terms
of retention, promotion, raises, or otherwise by not receiving
the forty-five or ninety day evaluations.

   For the foregoing reasons, summary judgment is due to be
granted on plaintiff's breach of contract claims.

   In summary, the Court finds that no material issues of fact
remain and that defendants MG Broadcasting of Birmingham, Inc.
and Eric S. Land are entitled to judgment as a matter of law as
to all fraud claims asserted against them by plaintiff Ernie
Freeman under Count Five and that defendant MG Broadcasting is
entitled to judgment as a matter of law as to all breach of

contract claims asserted against it by plaintiff Ernie Freeman under Court Four.

As noted earlier, this action involves separate claims by seven plaintiffs, which claims are largely individual to each plaintiff and are predicated on facts unique to each plaintiff. One of the problems associated with joining separate claims of seven plaintiffs in an action is the difficulty for the attorneys (and particularly counsel for plaintiffs) to give proper evaluation and advice to their clients with regard to the claims of each plaintiff and be able to disregard the impact on the case as a whole of a settlement between the defendant and one plaintiff. Another problem with such a joinder is the temptation to include in the complaint claims that have little merit or no merit at all.[11]  The Court this day is disposing of additional claims of Ernie Freeman which had little or no merit, leaving only his Title VII and § 1981 claims under Counts One and Two. The Court strongly urges Freeman and MG Broadcasting, and their attorneys, quickly to engage in settlement discussions or mediation with regard to those claims and to do so without

---

[11] For example, the claims removed from this case by the orders entered September 11, 2000 (Document Number 92) and November 2, 2000 (Document Number 115).

24

considering the claims of the remaining plaintiffs in this case. To increase the chances of a quick settlement of Freeman's claims, the Court determines that there is no just reason for delaying the entry of a partial final judgment under Fed. R. Civ. P. 54(b) embracing the claims of Ernie Freeman against Eric S. Land and MG Broadcasting resolved by this Memorandum of Decision and will direct the entry of such a judgment in favor of defendants under Count Four and Count Five. A separate order will be entered.

DONE this $\underline{1^{st}}$ day of December, 2000.

James H. Hancock

SENIOR UNITED STATES DISTRICT JUDGE