IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

00 DEC 28 PM 1: 10

U.S. ___ ___ __ COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SAMUEL L. SMITH, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV99-H-1276-S |
| MG BROADCASTING OF BIRMINGHAM, | ) | |
| INC., corporation d/b/a | | |
| WIAT-TV; and ERIC S. LAND, | ) | |
| an individual, | | |
| | ) | |
| DEFENDANTS. | | |

ENTERED

DEC 2 8 2000

MEMORANDUM OF DECISION

The court has before it the September 6, 2000 motion of defendants MG Broadcasting of Birmingham, Inc. and Eric S. Land for summary judgment in their favor with regard to the claim of Samuel Smith against them for fraud under Count Five and the September 6, 2000 motion of MG Broadcasting for summary judgment in its favor with regard to the claims of Samuel Smith against it for breach of contract under Count Four and fraudulent suppression under Count Six.[1]  Pursuant to "ORDER NUMBER THREE"

_____

[1]  Other than the claims described above, the only remaining claims by Samuel Smith in this action are against MG Broadcasting under Title VII (Count One) and Section 1981 (Count Two).  Those claims, while addressed by the September 6, 2000 motion for summary judgment, have not been the subject of any submission order.  See the September 25, 2000 order (Document Number 100).

entered September 18, 2000 (Document Number 97), the motion for summary judgment as to such claims is now under submission.  The parties have presented to the court evidence in support of and in opposition to the motion, as well as briefs addressing the issues now under submission.[2]

## I.  Procedural History

Plaintiff Smith and six other plaintiffs commenced this action May 20, 1999 asserting a variety of claims against MG Broadcasting, Land, and Media General, Inc.  Media General was dismissed with prejudice by the November 2, 2000 order (Document Number 115).  Conversion and defamation claims (Counts Seven and Eight respectively) by two of the plaintiffs were dismissed September 11, 2000 (Document Number 92).  Following extended discovery the remaining two defendants filed motions for summary judgment on September 6, 2000 with regard to all remaining claims asserted by the plaintiffs.  Those motions, as they addressed some of the claims, were the subject of "Order Number One" and "Order Number Two," both being submission orders entered September 18, 2000 (Document Numbers 95 and 96), but those claims

---

[2]  Such evidentiary submissions and briefs by defendants also were submitted in connection with the claims of Smith under Counts One and Two, which are not under submission at this time.

became moot with the dismissal of Media General as a party defendant on November 2, 2000.  A third order of submission, Order Number Three, also entered September 18, 2000 (Document Number 97), is the submission order which is applicable to the claims which are the subject of this memorandum of decision.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>Id.</u> at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  <u>See Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991)(<u>en banc</u>)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the

4

burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record

5

evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts

MG Broadcasting of Birmingham, Inc. acquired the assets of WBMG-TV on January 7, 1997, as an indirect wholly-owned subsidiary of Media General, Inc.  (Land Decl. ¶ 2).  WBMG-TV later became WIAT-TV ("WIAT").  (<u>Id.</u>).  WBMG-TV/WIAT is a CBS affiliate in the Birmingham/Tuscaloosa/Anniston market.  Eric Land has been President and General Manager of WBMG-TV/WIAT since March 25, 1997.  In this capacity, he manages the day-to-day operation of the station. (<u>Id.</u> ¶ 1; Land dep. 429).  Susan Ellenburg is Land's Executive Assistant and the Station's Human Resources Coordinator.

In 1997, WBMG-TV was in last place among the four major network affiliated television stations in the local news market (WIAT Ans. To Interrog. #14; Land dep. 95-96) and undertook an

6

effort to reformat its news programs, with the assistance of a
consultant company, in order to improve its ratings.  (WIAT Ans.
To Interrog. #14).  In this effort, Media General and local
management in Birmingham adopted (in late November 1997) and
implemented a plan to remake the station's news operation,
including (1) shutting down the station's news programming in
January 1998 and the first week of February 1998 in order to
enact the changes; (2) relaunching the entire station with the
new call letters WIAT-TV, a new set, new graphics, etc. on
February 5, 1998; and (3) relaunching the news program in a new
"News for Busy People" format, under which only anchors (not
reporters) would be seen on air and short news segments would be
provided.  (Id.).  Since the relaunch, WIAT's ratings, revenue,
and market share have increased; it has received industry awards
as well as positive public feedback.  (Land dep. 97-98, 132, 137-
39, 142).

On September 23, 1995, Plaintiff began employment with WBMG,
the predecessor of WIAT.  (Smith dep. 20).  While employed at
WBMG, plaintiff worked as a sports reporter and also as a weekend
sports anchor.  (WIAT Ans. to Interrog. No. 6; Def.'s Ans. to
Smith's Compl. ¶ 31).  Plaintiff did not receive performance

evaluations on the 45th and 90th days of his employment with
WBMG.  (Compl. ¶ 30; Smith dep. 577; Pl.'s Br. 13).

In January 1996, plaintiff was offered an employment
contract (Ellenburg decl. ¶ 8), which plaintiff had a chance to
read and did read before signing the contract on February 1,
1996.  (Smith dep. 328).  Plaintiff executed a three-year
contract of employment with Birmingham Television Corporation,
the owner of WBMG prior to its acquisition by MG Broadcasting in
January 1997.[3]  (Land decl. ¶ 2).  The contract provided for an
automatic raise in January of each of the following two years.
It also provided: (1) that plaintiff's hours and duties would be
determined by the News Director (Def. Exh. 4, Employment Contract
¶ 1, p. 1); (2) that the Station was to have sole and exclusive
right to plaintiff's services and the broadcast of his
performances; (3) that plaintiff was not to allow his image or
likeness to be used by by any radio or television station not
licensed to his employer or to represent any interest which
willing conflicted with the "full and faithful" performance of
plaintiff's duties to his employer (id., pp. 3-4); (4) that

_____

[3] As part of the January 7, 1997 acquisition by MG
Broadcasting, WBMG assumed all of Birmingham Television
Corporation's employment contracts at the Station.  (Land decl. ¶
2).

plaintiff could be terminated for cause or for breach of any material provision of his employment contract (id., pp. 1-2); (5) that the contract could not be changed or terminated orally; (4) a merger clause which stated:  "This Agreement contains the entire understanding of the parties . . ."; and (6) a waiver provision provided that "[a]ll waivers must be in writing to be effective" and any waiver "shall not constitute a waiver of any subsequent breach . . . or a waiver of such terms or conditions for the future . . . ."  (id.¶¶ 15, 18 p. 7),

When plaintiff started work with the Station, he received a copy of the Station's policies and procedures manual, (Smith dep. 101),  which stated that "the contents of this manual do not constitute the terms of a contract of employment; that employment with defendant is on an "at-will basis," may be terminated at any time by either party, and any oral statements to the contrary by an agent of defendant are "invalid and should not be relied upon by prospective or existing employees." (Def. Exh. 10, Policy & Procedure Manual, Introduction).

The Station's evaluation policy provided for employee performance evaluations on the 45th and 90th days of employment and annually thereafter.  (Def. Exh. 10, Manual, Policy E-5). Evaluations affect decisions with regard to retention, promotion,

and raises.  (Ellenburg dep. 48, 73-74).  In January of 1997,
plaintiff received an automatic pay raise in accordance with his
employment contract.  (Ellenburg decla. ¶ 8).  Plaintiff was in
the July annual merit review cycle.  He received a performance
evaluation in July of 1997 from then-News Director, Willie
Walker.  (Smith dep. 611-12).

Prior to MG Broadcasting's acquisition of WBMG and prior to
Land's employment with the Station, plaintiff discussed free-
lance activities with Hoyle Broome, then-General Manager.  Broome
informed plaintiff that it was okay to do free-lance work with
permission from the News Director.  (Smith dep. 103-04).

At some time in 1997, while plaintiff was still under
contract with the Station, according to plaintiff, Walker learned
that plaintiff was interested in a job in Shreveport.  Walker
informed plaintiff that if he pursued or took the Shreveport job
at that time, he would be sued.  (Id. 349).

In August of 1997, plaintiff made a request to then-News
Director Willie Walker with regard to free-lance work for an ESPN
project entitled Black College Sports Today.[4]  This request was

_____

[4] Plaintiff claims that he made a written request to and
received at least verbal permission from Willie Walker (Smith
dep. 103-12), although plaintiff is unable to produce such
writing.  (Id. 104-06, 108).  Defendant claims that it had not

10

made prior to plaintiff's committing to this project.  According
to plaintiff, Walker approved the free-lance work.  (Smith dep.
103-12).  Plaintiff is not certain whether he asked Walker for
permission to perform free-lance work subsequent to August 1997.
(Smith dep. 112-13).

From September 1997 through March 1998, plaintiff was
involved in free-lance work projects with ESPN, CBS Sports, and
World Sports Enterprises (CBS Cable).  (Def. Exh. 1, Pl.'s Ans.
to Def. Interrog. No. 6; Smith dep. 133, 143, 147).  In doing
this work, plaintiff used labor and materials owned by the
Station, including using WIAT-employed cameramen, vehicles,
cameras and other equipment, videotape, and long distance phone
calls.  (Smith dep. 143, 147-48, 153-54, 184, 525-27, 530; Pl.'s
Ans. to Def.'s Interrog. Nos. 6 & 7).  In addition, plaintiff
received payment for sending video footage owned by the Station
and "soundbite" material copyrighted by the Station to CBS Sports
and World Sports Enterprises/CBS Cable, entities competing with

_____

given Walker authority to approve plaintiff's free-lance
activities prior to plaintiff's termination.  (Land dep. 367).

11

WIAT/Channel 42.   (Smith dep. 147-54, 157-61. 525-27; Pl.'s Ans.
to Def.'s Interrog. No. 6).[5]

In December 1997 or January 1998, plaintiff claims that he
questioned Land and Walker separately about whether his
employment was secure in light of "mass firings" in connection
with the new format.[6]  (Smith dep. 27-31).  According to
plaintiff, Land and Walker informed plaintiff that he would be
retained as a weekend sports anchor through the transition to the
new format.  (Id.).  Plaintiff was retained as a weekend sports
anchor after the new format was launched and was the only anchor
retained by the Station in its conversion to the new format.
(Id. 26, 348-52).

In January 1998, plaintiff received a pay raise in
accordance with his employment contract.  (Ellenburg decla. ¶ 8).

In February 1998, plaintiff claims that his job was
threatened by Willie Walker in a meeting regarding remarks

_____

[5] Land testified that he did not learn of plaintiff's use of
Station assets without permission until plaintiff's February 2000
deposition.  Land testified that had he know of this unauthorized
use, he would have terminated plaintiff for taking WIAT's assets
without permission.  (Land decl. ¶ 29).

[6] Plaintiff claims that Land promised him that he would
receive a new contract of employment, (Smith dep. 27-31), and
also seems to claim that such oral promise constituted a new
contract of employment.  (See Compl. ¶ 63).

plaintiff had made about Paul Finebaum, the newly hired Sports Director and plaintiff's immediate supervisor.  According to plaintiff, plaintiff was told that Finebaum had the authority to decide whether plaintiff would remain employed at the station and that if plaintiff could not work with Finebaum, he could no longer work at the Station.  (Scott dep. 349, 370-71).

After the February 1998 relaunch Walker became Executive Producer for a two to three week period, and Al Blinke became interim News Director.  (Smith dep. 73).  Plaintiff did not receive permission from Blinke for plaintiff's free-lance activities.  (Smith dep. 113-14, 281).  Blinke refused at least one such request from plaintiff.  (Id. 113-14).  Later in February 1998, Walker left the Station.[7]  Micah Johnson was hired as the News Director in March of 1998.  (Johnson decla. ¶ 1). Plaintiff did not seek permission to do the free-lance work from Johnson and did not discuss the free-lance work with Johnson prior to July 1998.  (Johnson decla. ¶ 15; Smith dep. 281-82). Plaintiff claims that WIAT posted a weekend sports anchor job in

_____

[7] Any waiver by Walker would not have had continuing effect on free-lance activities by plaintiff after Walker left the Station.  (See Employment Contract, ¶ 15, p. 7).

13

March and April of 1998 in The Birmingham News and The Atlanta

Journal Constitution.[8]   (Smith dep. 304, 379-81).

    At some time between late January 1998 and July 1998,

paychecks for some of plaintiff's free-lance activities (for

World Sports Enterprises/CBS Sports Cable and CBS Sports Nework)

were sent to him at the Station via regular mail.[9]   (Smith dep.

_____

    [8] Plaintiff cannot recall whether the position posted was
for a part-time or full-time position.  (Smith dep. 304).   The
Court notes that plaintiff has not produced evidence of either
alleged posting.  (See Pl.'s Evid. Subm. in Opp'n to Def.'s Mot.
Summ. J.).

    [9] It is undisputed that at some time prior to the
termination of plaintiff's employment, Ellenburg, Land, and
Johnson learned of plaintiff's unauthorized free-lance work from
paychecks for this work which were sent to the Station. It is
unclear when such checks were received at the Station. In his
deposition, plaintiff alleges that such checks were sent as early
as January 1998, at which time he inquired about them with Peggy
Davis and Susan Ellenburg.  Plaintiff testified that he inquired
of Peggy Davis, Walker's secretary, on at least two occasions
about looking for a check from CBS Sports with plaintiff's name
on it in the mail and that on one such occasion, Ellenburg was in
the area where plaintiff was talking with Davis about the check,
and Ellenburg made a remark to plaintiff concerning telling
plaintiff's wife about the check.  (Smith dep. 161-67, 170-71,
350-51).  (Plaintiff does not testify that he asked Ellenburg
directly about the checks).  He also alleges that the checks were
sent in March and/or April of 1998.  (Pl.'s Br. 12).   In
plaintiff's statement accompanying his EEOC charge, plaintiff
stated that there were two checks for free-lance work dated April
23, 1998 and June 23, 1998. and that he told Ellenburg about the
checks two weeks prior to his termination on July 23, 1998.
Ellenburg and Johnson have testified that they did not know about
plaintiff's free-lance activities until June or early July 1998
and that they learned of the activities through the paychecks

14

133-34, 161, 263-64, 267; Pl.'s Ans. to  Def.'s Interrog. No. 6).
Johnson began receiving these checks from Ellenburg, who receives
and distributes the Station's mail.   The envelopes showed the
return addresses of entities competing with the Station and
contained a window indicating that checks were enclosed.
(Johnson decl. ¶ 14).  Johnson held the first of these checks for
some period of time to allow plaintiff to ask for it.  (Id.).
Around the time that the checks arrived, another employee of the
Station approached Johnson regarding plaintiff's free-lance work,
stating that he/she had seen plaintiff doing a report on another
network and asking whether such work was permissible.  (Id.).
Plaintiff did not give any portion of the money he received from
free-lance activities to the Station.  (Smith dep. 143; Pl.'s
Ans. to Def.'s Interrog. No. 8).  He did give a portion of the
money to the Station's cameramen who had helped plaintiff with
these activities.  (Smith dep. 148).

      In July of 1998, Johnson, Ellenburg, and Land met and
decided that plaintiff had violated his employment contract by
performing unauthorized free-lance work and that he should

---

sent to plaintiff at the Station.  (Johnson decl. ¶ 14; Ellenburg
dep. 140).  Land testified that he did not learn of the free-
lance work until immediately prior to plaintiff's termination.
(Land dep. 370).

therefore be terminated.  (Johnson decla. ¶ 15; Land dep. 370).

Johnson and Land discussed the checks and plaintiff's free-lance

activities with plaintiff, and plaintiff was then notified that

his employment with defendant was to be terminated effective July

23, 1998, prior to the completion of his three-year employment

contract which ran through January 1999 (Smith dep. 305), for

violating the provisions of plaintiff's contract which gave WIAT

the exclusive use of plaintiff's image and prohibited work for

WIAT's competitors.  (Smith dep. 13, 288-89, 291; Johnson decla.

¶ 15).

Plaintiff did not receive a performance evaluation in July

of 1998, the month in which his employment with the Station was

terminated.  (Ellenburg decla. ¶ 8).  Plaintiff was not

terminated because of performance issues; he was terminated for

violating the terms of his employment contract.  (Smith dep. 13,

288-89, 291; Johnson decla. ¶ 15).  Plaintiff was informed by

Land, Johnson, and Ellenburg that because he had been required to

work 150 days straight and had been unable to take vacation, he

would still be paid by WIAT through the end of September; WIAT

continued to pay plaintiff through the end of September.

16

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint contains the following claims now under consideration: (1) fraud (Count Five), (2) breach of contract (Count Four), and (3) fraudulent suppression (Count Six).  Defendants' motion for summary judgment asserts that there is no genuine issue as to any material fact and that (1) plaintiff acted in breach of his contract; (2) plaintiff is unable to demonstrate the necessary elements of a fraudulent suppression claim; and (3) plaintiff's fraud claim is utterly without merit.  Plaintiff maintains that genuine issues of fact remain as to his claims.  The Court will address plaintiff's claims separately.

### A.  Fraud Claim

Plaintiff claims fraud with regard to an alleged assurance by Land in December 1997 or January 1998 that plaintiff would receive a new employment contract.  (See Pl.'s Br. 18). Plaintiff maintains that the posting of his job in March 1998, prior to any knowledge of plaintiff's free-lance work, could demonstrate an intent to deceive when Land made the alleged assurance two to three months earlier.  In support of his claim, plaintiff relies on testimony of Susan Ellenburg regarding circumstances when employees have been let out of their contracts

17

and regarding defendants' knowledge of plaintiff's free-lance work.  (Id.)

Defendants argue that plaintiff's fraud allegations cannot sustain a claim for fraud because:  (1) plaintiff's job duties and his termination complied with the express terms of his contract and therefore evidence no misrepresentation; (2) plaintiff could not have relied upon any oral statement by Land that was made during plaintiff's employment contract, because the contract required all modifications to be in writing; (3) plaintiff's allegations fail to meet any of the three elements required to show that an employment contract is not terminable at will; (4) plaintiff's allegations fail to demonstrate the necessary elements for promissory fraud; and (5) plaintiff's claim fails for lack of particularity under Fed. R. Civ. P. Rule 9(b), because plaintiff has not asserted any facts that qualify as misrepresentations, has not demonstrated any misrepresentation by defendant Land, has failed to allege in what ways plaintiff was misled, and has failed to allege what defendants gained by the alleged fraud. (See Def.'s Br. 31-35).  Defendants maintain that plaintiff was terminated for violating his original and only employment contract, which was to continue through January 1999. (Id.).

18

In order to establish a prima facie case of fraud, the plaintiff must prove the following four elements: (1) that defendant made a false statement regarding a material fact to the plaintiff; (2) that defendant made the misrepresentation willfully, with the <u>intent to deceive the plaintiff and with a present intent not to perform</u>;[10] (3) that plaintiff reasonably relied on the misrepresentation; and (4) that plaintiff suffered some damage or injury as a proximate result of his reliance on the misrepresentation.  See <u>Hughes v. Hertz Corp.</u>, 670 So.2d 882, 885 (Ala. 1995).  Plaintiff has alleged fraud based on an alleged promise by defendant Land in December 1997 or January 1998 that plaintiff would receive a new employment contract.  The Court finds that plaintiff has failed to establish a prima facie case of fraud.

_____

[10] Under Alabama law, "fraud" can also be a misrepresentation of an *existing* fact made recklessly, negligently, or innocently.  See <u>Hughes</u>, 670 So. 2d 882 at 888. "However, the law places a heavier burden in those fraud actions where one attempts to prove fraud based on a misrepresentation relating to an event to occur in the future," <u>National Sec. Ins. Co. v. Donaldson</u>, 664 So. 2d 871, 876 (Ala. 1995), in which case the plaintiff must additionally show that, "at the time of the alleged misrepresentation (the promise), the defendant did not intend to do the act or acts promised and intended to deceive the plaintiff." <u>McGriff v. Minnesota Mut. Life Ins. Co.</u>, 127 F.3d 1410, 1414 (11th Cir. 1997); <u>see also</u> <u>Russellville Prod. Credit Assoc. v. Frost</u>, 484 So. 2d 1084, 1087 (Ala. 1986); <u>Kennedy Electric Co. v. Moore-Handley, Inc.</u>, 437 So. 2d 76 (Ala. 1983).

First, the alleged representation at issue was a promise about what defendants might do in the future.  Plaintiff has not pointed to evidence to establish that defendants (MG Broadcasting through its employee, Land, and Land, individually) made a representation that was false nor that the alleged representation at issue was made with an intent to deceive plaintiff and with a present intent not to perform.  Plaintiff contends that Land promised him a new contract more than one year before the plaintiff's original employment contract was to end.  He asserts that because Land did not know of his free-lance work at the time the alleged promise was made and because plaintiff's job was allegedly posted two to three months later[11] that Land had an intent to deceive plaintiff and a present intent not to perform when the alleged promise was made.  It is undisputed that plaintiff was not terminated for performance-related issues and the evidence shows that there were no problems with the quality of plaintiff's work; had plaintiff not been terminated for violating his contract, there is no evidence that this alleged promise would not have been carried out at the time plaintiff's

---

[11] Plaintiff has submitted no evidence to support his allegation that his job was posted in March 1998.

20

original contract was to expire.[12]  The evidence shows that
plaintiff was retained for seven to eight months after this
alleged "assurance" regarding his employment; he was retained
until defendants ascertained that plaintiff had violated his
contract of employment.

---

[12]   The Court notes that plaintiff made no mention of this
alleged promise in the factual allegations of his Complaint (See
Compl. ¶¶ 31-33); yet with regard to his fraud claim, he
generally alleges that "[a]t the aforesaid times and places,
defendants, including LAND, made statements, representations,
promises, and commitments to plaintiffs . . . regarding their
employment . . . " and that such statements were "made with the
intent to induce plaintiffs to accept the employment offer of
defendants." (See Compl. ¶¶ 59-60).  Then, under plaintiff's
fraudulent suppression claim, plaintiff alleges that "[a]t
numerous times and on numerous occasions, plaintiff SMITH was
promised long-term permanent employment with corporate
defendants" and that such oral representations constituted
contracts of employment." (See Compl. ¶ 63).  In his deposition
testimony, plaintiff appears to allege that fraud arose over a
period of time based on several different events, beginning with
(1) Walker's alleged statement in 1997 that plaintiff would be
sued if he pursued or took a job in Shreveport (while he was
still under contract with the Station), then (2) the February
1998 meeting where plaintiff's "job was threatened" because of
remarks he admittedly made about his supervisor, Paul Finebaum,
followed by (3) the December 1997/January 1998 alleged
"assurance" regarding plaintiff's employment and a new contract,
and culminating in (4) plaintiff's termination on July 23, 1998.
(See Smith dep. 348-53, 378-81, 419-20).  As to defendant Land
specifically, plaintiff points to only one specific incident, an
alleged assurance of continued employment and a new contract in
December 1997 or January 1998.  (See Pl.' Ans. to Def.'s
Interrog. No. 12).

Second, plaintiff has failed to demonstrate that he reasonably relied on the alleged misrepresentations.  Reliance requires plaintiff to demonstrate that his belief in the fact misrepresented by the defendant caused him to take some specific action or refrain from taking some specific action; that plaintiff would have acted differently had he known the truth. Such reliance must be <u>reasonable</u>:  whether an ordinarily prudent person, situated similarly to plaintiff, and exercising due care, would have relied on the misrepresentation under all of the surrounding circumstances.  <u>See</u> <u>Foremost Ins. Co. v. Parham</u>, 693 So. 2d 409 (Ala. 1997) (<u>citing</u> <u>Torres v. State Farm Fire & Casualty Co.</u>, 438 So. 2d 757 (Ala. 1983)).  In addition, under the law, a person who signs a contract is under a duty to read the contents of that contract and is bound to the terms of the contract, regardless of whether he reads the contract.  <u>Locklear Dodge City, Inc. v. Kimbrell</u>, 703 So. 2d 303, 306 (Ala. 1997).

Plaintiff signed a contract of employment which (1) contained a clear and unambiguous merger clause evidencing the parties' intention that the writing serve as a complete integration of their agreement[13]: "[t]he Agreement contains the

---

[13] <u>See</u> <u>Moore v. Pennsylvania Castle Energy Corp.</u>, 89 F.3d 791, 796-97 (11th Cir. 1996) (holding that whether a contract is

entire understanding of the parties" (Def. Exh. 4, Employment
Agreement ¶ 18); (2) provided that "[t]he Agreement cannot be
changed or terminated orally (Id.); and (3) referenced
defendant's policies and procedures manual which contained
provisions stating that "the contents of this manual do not
constitute the terms of a contract of employment" and further
stating that employment with defendant is on an "at-will basis,"
may be terminated at any time by either party, and any oral
statements to the contrary by an agent of defendant are "invalid
and should not be relied upon by prospective or existing
employees." (Personnel Policy Manual, Introduction).  Plaintiff
received in February 1998, subsequent to the alleged
misrepresentation by Land, the increase in salary guaranteed
under his original (and only) employment contract, which
controlled the rights of the parties at all times material to
this action.  Plaintiff has testified that he understood that he
could be terminated for violating his contract, despite any
representations regarding a new contract.  Given these facts,
plaintiff cannot now successfully argue that he <u>reasonably</u> relied

---

ambiguous and whether a writing is a complete integration of the
parties' agreement are questions of law for the court).

on any oral representation that he was promised a new contract,[14] more than one year prior to the expiration of his original contract, and that he was injured thereby.  Any such reliance by plaintiff would not have been reasonable under these circumstances.

For the foregoing reasons, defendants MG Broadcasting and Eric Land are entitled to summary judgment in their favor as to all of plaintiff's fraud claims against them.

### B.   Breach of Contract Claim

Plaintiff alleges breach of contract based upon (1) the termination of his employment and (2) the lack of performance evaluations on the 45th and 90th days of his employment.  (Pl.'s Br. 12-14).  As to damages, plaintiff maintains that because he was not retained, a question of fact exists as to whether he was damaged by not receiving the 45- and 90-day evaluations.

---

[14] Plaintiff cannot successfully argue that such representation constituted a contract of employment.  Any such representation could have at most constituted only employment at-will, because plaintiff has failed to demonstrate that there was an a clear and unequivocal offer of permanent employment (lifetime employment or employment of a definite duration) or that he provided substantial consideration for such alleged contract separate from the services to be rendered under his original February 1996 contract.  See Wesson v. Huntsman Corp., 206 F.3d 1150, 1153 (11th Cir. 2000).

Plaintiff also maintains that a question of fact exists as to when defendants knew of plaintiff's free-lance work.  (Id. 13).

Defendant argues (1) that plaintiff has failed to identify and cannot prove that specific provisions of his employment contract were violated by the termination of his employment; (2) that plaintiff, not defendants, failed to comply with the terms of plaintiff's employment contract, because plaintiff's unauthorized free-lance projects and his use of WIAT copyrighted footage and equipment on those projects contravened the terms of plaintiff's contract; (3) that plaintiff's hours were in accordance with the terms of his employment contract, which provided that plaintiff's hours would be determined by the Station's news director;[15] and (4) that plaintiff has failed to allege why his failure to receive performance evaluations is

_____

[15] The Court notes that although plaintiff's Complaint contains allegations regarding the number of days he worked at the Station without time off, such allegations appear to be related to plaintiff's Title VII claim, rather than to his breach of contract claim. (See Compl. ¶¶ 32, 57). To the extent that plaintiff has attempted to assert any breach of contract claim based upon the number of days he worked at the Station, defendant MG Broadcasting is entitled to summary judgment on such claim. Plaintiff's employment contract clearly provided that plaintiff's hours and duties would be determined by the Station's News Director. (Def. Exh. 5, Employment Contract, ¶ 1, pp. 1, 7). Therefore, an allegation based on the number of days plaintiff worked cannot sustain a breach of contract claim.

material or relevant to his breach of contract claim.  (Def.'s
Br. 28-31).

     A breach of contract is defined as a "failure, without
legal excuse, to perform any promise which forms the whole or
part of a contract."  In order to establish a breach of contract,
plaintiff "must prove: (1) the existence of a valid contract[16]
binding the parties in the action, (2) [plaintiff's] own
performance under the contract, (3) the defendant's
nonperformance, and (4) damages."  <u>Mann v. Bank of Tallassee</u>, 694
So. 2d 1375, 1380 (Ala. Civ. App. 1996) (citations omitted).

     The evidence shows that the contract under which plaintiff
was employed during all times material to this action provided
(1) that it could not be changed or terminated orally; (2) that
"the use of [plaintiff's] name or likeness in connection with . .
. any radio or television station not licensed to [plaintiff's

---

[16] As previously set forth under the analysis of plaintiff's
fraud claim, the original employment contract, signed by
plaintiff on February 1, 1996, governs the rights of the parties
in this case and is the only contract plaintiff has demonstrated
in this case.  To the extent that plaintiff has attempted to
assert a breach of contract claim based upon any alleged oral
representation by Land that plaintiff would receive a new
contract for permanent employment, as previously established,
plaintiff has failed to demonstrate the elements required to
establish such a contract and, therefore, cannot base a breach of
contract action thereon.

26

employer]" was prohibited; (3) that plaintiff was prohibited from engaging in any activity that "conflict[ed] with the full and faithful performance of [plaintiff's] duties" with WIAT; and (4) that any waiver of the contract's terms "must be in writing to be effective."  (Def. Exh. 4, Employment Contract ¶¶ 18, 5, 6, 15, pp. 3-4, 7).  Although plaintiff has alleged that he received approval from Walker for the ESPN free-lance project, he has not alleged nor offered evidence that such alleged approval was written, as required by the terms of plaintiff's contract.  Any oral waiver would not be valid under the terms of plaintiff's contract, and thus his unauthorized work on the free-lance projects was in violation of his employment contract.[17] Furthermore, plaintiff's use of the Station's equipment, labor, and copywritten video footage, without permission, in the performance of these free-lance projects was also a violation of plaintiff's employment contract.  (Smith dep. 143, 153-54, 526-27; Def. Exh. 1, Pl.'s Ans. to Def.'s Interrog. No. 7; Pl.'s Supp. Ans. to Def.'s Interrog. No. 7).  Plaintiff has admitted

---

[17] Plaintiff's own allegations suggest that he knew that, without a written waiver, such free-lance work would be in violation of his employment contract, because he alleges that he submitted a written request for a waiver to Walker before beginning his free-lance work.

that he knew he could be fired for violating his current contract, that his contract prohibited free-lance work without prior permission, and that the station owned his image and performance under his contract. (Smith dep. 100-01, 157, 352-53). Because plaintiff violated the terms of his employment contract, he cannot establish his performance under the contract and therefore cannot establish a breach of contract claim against defendant MG Broadcasting.

As to any alleged violation of the station's policies regarding performance evaluations, although the policy manual was referenced in plaintiff's written contract, the introduction to the manual clearly states that the contents of the manual do not constitute a contract of employment.[18]   Plaintiff received an

---

[18] While the Alabama Supreme Court has held that a policy contained in an employee manual can become a binding promise once it is accepted by the employee through his continuing to work when he is not required to do so (where the language used is specific enough to constitute an actual offer rather than a mere general statement of policy), it has also made clear that "if the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, [it] is free to so state in the handbook." Hoffman-La Roche, Inc. v. Campbell, 512 So. 2d 725 (Ala. 1987) (quoting McCluskey v. Unicare Health Facility, Inc., 484 So. 2d 398, 400 (Ala. 1986) (holding handbook provisions not enforceable against employer where handbook expressly stated that Handbook and policies therein "'do not in any way constitute, and should not be construed as a contract of employment . . . or a promise of employment.'")).

annual merit review in July 1997, seven months after MG
Broadcasting acquired the Station.  Plaintiff's employment was
terminated in July 1998, the month in which he would have been
due to receive another annual merit review.  Plaintiff received
raises in accordance with his contract in January 1997 and
January 1998.  Plaintiff cannot maintain a breach of contract
action based upon performance evaluations because (1) the policy
manual is not a contract of employment; (2) plaintiff has failed
to demonstrate that he was in any way damaged as a result of not
receiving 45- and 90-day evaluations--to the contrary, plaintiff
received a three-year employment contract, including two raises
in pay, subsequent to his ninetieth day of employment with the
predecessor of MG Broadcasting; and (3) when plaintiff's 45- and
90-day evaluations would have been due, plaintiff was employed by
and would have received such evaluations from WBMG/his then-
employer Birmingham Television Corporation, which is not a party
to this case; such evaluations would have been due more than one
year prior to the date on which MG Broadcasting acquired the
assets of WBMG/WIAT.

     For the foregoing reasons, defendant MG Broadcasting is
entitled to summary judgment in its favor as to plaintiff's
breach of contract claims against it.

### C.  Fraudulent Suppression Claims

Plaintiff alleges fraudulent suppression based upon the same allegation as his fraud claim: an alleged representation by Land in December 1997/January 1998 that plaintiff would receive a new, long-term employment contract and that plaintiff's employment was secure.[19]  Plaintiff maintains that prior to April 1998, defendant knew that it did not intend to continue plaintiff's employment (contrary to Land's alleged prior representation regarding a long-term employment contract); that defendant had a duty to disclose this fact to plaintiff, and that defendant breached this duty by suppressing this fact from plaintiff.  (See Compl. ¶¶ 31-32, 62-65; Pl.'s Br. 18).  Plaintiff asserts that he refrained from pursuing other employment and career opportunities in reliance on the alleged misrepresentation and that he was injured thereby.  (Compl. ¶¶ 64-65).

Defendant argues that there was no duty to disclose in this case (prior to plaintiff's actual termination on July 23, 1998), where the parties were at arms length and the employment

---

[19] Plaintiff alleges that he was promised long-term permanent employment with the Station "at numerous times and on numerous occasions," (Compl. ¶ 17); however, plaintiff's brief addresses only one alleged representation made by Land.  (Pl's Br. 18).

contract, which did not provide for such a duty, governed the rights of the parties.

In order to establish a prima facie case of suppression, plaintiff must prove "(1) a duty to disclose the facts, (2) concealment or nondisclosure of material facts by the defendant, (3) inducement of the plaintiff to act, and (4) action by the plaintiff to his injury." Feil v. Wittern Group, Inc., No. 2990346, 2000 WL 1763258, at *10 (Ala. Civ. App. Dec. 1, 2000) (quoting Foremost Ins. Co. v. Parham, 693 So. 2d 409, 423 (Ala. 1997); see also Prudential Ballard Realty Co. v. Weatherly, No. 1981671, 2000 WL 1763395 (Ala. Dec. 1, 2000).

Whether a duty to disclose exists is a question of law for the Court. State Farm Fire & Gas Co. v. Owen, 729 So.2d 834, 842-43. Under Ala. Code § 6-5-102, a duty of disclosure may be created through either (1) a confidential relationship of the parties or (2) "special circumstances" mandating disclosure. Id. Whether special circumstances create a duty to disclose requires a case-by-case consideration of several factors: "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (3) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." Id. In

31

addition, a request for information can create a duty to disclose.  Ex parte Walden, No. 1990043, 2000 WL 1651280, at *3 (Ala. Nov. 3, 2000).  Mere silence in the absence of a duty to disclose is not fraudulent.  (Id.).

Plaintiff has failed to establish a claim of fraudulent suppression, because he has failed to demonstrate the first element of such a claim:  that defendant had a duty to disclose its intent to terminate plaintiff's employment prior to plaintiff's actual termination on July 23, 1998.  Alabama caselaw has long established that an arms length relationship does not create a duty to disclose, when information is not requested. See, e.g., Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So. 2d 238 (Ala. 1992); RNH, Inc. v. Beatty, 571 So. 2d 1039 (Ala. 1990); Dominick v. Dixie Nat. Life Ins. Co., 809 F.2d 1559 (1987); DeWitt v. Long, 519 So. 2d 1363 (Ala. Civ. App. 1987).  The evidence demonstrates that the parties in this case were dealing at arm's length and that plaintiff only allegedly requested and received assurance regarding his employment on one occasion, December 1997 or January 1998, two to three months prior to the time his job was allegedly posted and seven to eight months prior to the time his employment was terminated. Plaintiff has not pointed to evidence to demonstrate that Land or

32

Walker had knowledge of any decision to terminate plaintiff's
employment at the time plaintiff allegedly requested assurance
from them or thereafter, until defendant (Land, Johnson, and
Ellenburg) learned of plaintiff's free-lance activities[20] which
were in violation of plaintiff's contract.  The parties'
relationship was governed by a contract which clearly provided
that plaintiff could be terminated for such unauthorized
activities, and plaintiff has acknowledged that he knew and
understood at the time he was performing the free-lance
activities (1) that without permission, such activities were
prohibited; (2) that under his contract, the Station owned
plaintiff's image; and (3) that his employment could be
terminated for violating his contract.  (Smith dep. 101, 157,
352-53).  Plaintiff has produced no evidence of a written waiver,
as required under the terms of his contract, and plaintiff has
testified that he did not even seek such a waiver or discuss his
free-lance activities with News Director Johnson, once Walker
left the Station.  Plaintiff has failed to demonstrate a duty to

_____

[20] The Court notes that even if such decision had been made
at some time after plaintiff's alleged December 1997/January 1998
request but prior to plaintiff's July 23, 1998 actual
termination, defendant had no duty to disclose such information
to plaintiff absent a request for such information.

disclose under these circumstances.  Because plaintiff has failed
to demonstrate the first element of fraudulent suppression, the
Court will not address the other elements of a fraudulent
suppression claim.  Defendant MG Broadcasting is entitled to
summary judgment in its favor as to all of plaintiff's fraudulent
suppression claims against it.

In summary, the Court finds that no material issues of fact
remain and that defendants MG Broadcasting of Birmingham, Inc.
and Eric S. Land are entitled to judgment as a matter of law as
to all fraud claims asserted against them by plaintiff Samuel
Smith under Count Five and that defendant MG Broadcasting is
entitled to judgment as a matter of law as to all breach of
contract claims asserted against it by plaintiff Samuel Smith
under Count Four and as to all fraudulent suppression claims
asserted against it by plaintiff Samuel Smith under Count Six..

As noted earlier, this action involves separate claims by
seven plaintiffs, which claims are largely individual to each
plaintiff and are predicated on facts unique to each plaintiff.
One of the problems associated with joining separate claims of
seven plaintiffs in an action is the difficulty for the attorneys
(and particularly counsel for plaintiffs) to give proper
evaluation and advice to their clients with regard to the claims

34

of each plaintiff and be able to disregard the impact on the case
as a whole of a settlement between the defendant and one
plaintiff.  Another problem with such a joinder is the temptation
to include in the complaint claims that have little merit or no
merit at all.[21]  The Court this day is disposing of additional
claims of Samuel Smith which had little or no merit, leaving only
his Title VII and § 1981 claims under Counts One and Two.  The
Court strongly urges Smith and MG Broadcasting, and their
attorneys, quickly to engage in settlement discussions or
mediation with regard to those claims and to do so without
considering the claims of the remaining plaintiffs in this case.
To increase the chances of a quick settlement of Smith's claims,
the Court determines that there is no just reason for delaying
the entry of a partial final judgment under Fed. R. Civ. P. 54(b)
embracing the claims of Samuel Smith against MG Broadcasting and
Eric S. Land resolved by this Memorandum of Decision and will
direct the entry of such a judgment in favor of defendants under
Count Four, Count Five, and Count Six.  A separate order will be
entered.

---

[21] For example, the claims removed from this case by the
orders entered September 11, 2000 (Document Number 92) and
November 2, 2000 (Document Number 115).

DONE this 28th day of December, 2000.

_____

SENIOR UNITED STATES DISTRICT JUDGE