IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

01 MAY 21 PM 2:03

U.S. DISTRICT COURT
N.D. OF ALABAMA

WILLIAM RANDALL SCOTT,          )

    PLAINTIFF,               )

VS.                             )          CV-99-H-1276-S

MG BROADCASTING OF             )
BIRMINGHAM, INC., d/b/a
WIAT-TV, corporation,          )

    DEFENDANT.               )

ENTERED

MAY 2 1 2001

## MEMORANDUM OF DECISION

The Court has before it the September 6, 2000 motion of

Defendant MG Broadcasting of Birmingham, Inc. for summary

judgment in its favor with regard to the claims of William

Randall Scott against it under Title VII (Count One) and Section

1981 (Count Two).  Pursuant to this Court's Order entered

December 19, 2000 (Document No. 129), the motion for summary

judgment as to such claims is now under submission.  The parties

have presented to the Court evidence in support of and in

opposition to the motion, as well as briefs addressing the issues

now under submission.

### I.  Procedural History

On December 19, 2000, the Court granted Defendants' motion

210

for summary judgment as to Plaintiff's claims against MG

Broadcasting and Eric S. Land for fraud (Count Five) and as to

Plaintiff's claims against MG Broadcasting for breach of contract

(Count Four). (Document No. 128).  The procedural history of this

case is outlined in detail in the Memorandum of Decision

accompanying the Court's December 19, 2000 Order.  (Document No.

127).  Plaintiff's only remaining claims in this action are his

claims of disparate treatment race discrimination and racially

hostile work environment under Title VII and Section 1981.

Plaintiff's disparate treatment claims are the subject of this

memorandum of decision.  His hostile work environment claims,

along with similar claims of the other six plaintiffs in this

case, will be the subject of a separate memorandum of decision.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary

judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment

as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir.

2000)  The party asking for summary judgment always bears the

2

initial responsibility of informing the court of the basis for
its motion and identifying those portions of the pleadings or
filings which it believes demonstrate the absence of a genuine
issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once
the moving party has met his burden, Rule 56(e) requires the
nonmoving party to go beyond the pleadings and by his own
affidavits, or by the depositions, answers to interrogatories,
and admissions of file, designate specific facts showing that
there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material
and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable
doubts about the facts and all justifiable inferences are
resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023;
Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.
1993).  A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the
evidence is merely colorable, or is not significantly probative,
summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to
discharge its initial burden depends on whether that party bears

3

the burden of proof on the issue at trial.  See Fitzpatrick, 2
F.3d at 1115-17 (citing United States v. Four Parcels of Real
Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the
moving party bears the burden of proof at trial, then it can only
meet its initial burden on summary judgment by coming forward
with positive evidence demonstrating the absence of a genuine
issue of material fact; i.e. facts that would entitle it to a
directed verdict if not controverted at trial.  Fitzpatrick, 2
F.3d at 1115.  Once the moving party makes such a showing, the
burden shifts to the non-moving party to produce significant,
probative evidence demonstrating a genuine issue for trial.

     If the moving party does not bear the burden of proof at
trial, it can satisfy its initial burden on summary judgment in
either of two ways.  First, the moving party may produce
affirmative evidence negating a material fact, thus demonstrating
that the non-moving party will be unable to prove its case at
trial.  Once the moving party satisfies its burden using this
method, the non-moving party must respond with positive evidence
sufficient to resist a motion for directed verdict at trial.

     The second method by which the moving party who does not
bear the burden of proof at trial can satisfy its initial burden
on summary judgment is to affirmatively show the absence of

evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[1]

Defendant MG Broadcasting of Birmingham, Inc. owned the
assets of WIAT-TV ("the Station") at all times material to this
action.[2]  The Station was relaunched in February 1998, the

_____

[1]  Additional facts surrounding Plaintiff's employment with
the Station are set forth in the Memorandum of Decision
accompanying the Court's December 19, 2000 Order. (See Document
No. 127) (granting summary judgment in favor of Defendants as to
Plaintiff Scott's fraud and breach of contract claims).  The
Court hereby incorporates those facts into this Memorandum of
Decision.

[2]  In 1992, several years prior to Defendant's purchase of
the Station, the National Association for the Advancement of
Colored People ("NAACP") filed a petition to block the renewal of
the Station's FCC license for alleged failure to comply with the
FCC's equal employment opportunity rules.  Thereafter, the
Station and the NAACP entered into a settlement agreement on
December 7, 1994, which provided, among other things, that the
Station would take several affirmative steps to diversify its
workforce.  The agreement was to expire "no later than April 1,
2000" and expressly stated that it ran with the license and would
be assigned to any new owner of the station in the event of a
sale during the term of the agreement.  At the time of these
events, the Station's General Manager was Hoyle Broome, and the
News Director was John Harrod, both of whom are white.  In
December 1995, one year after the settlement agreement was
signed, Broome hired Willy Walker, an African-American female, to
replace John Harrod as News Director, although Harrod remained
employed at the Station as a reporter for two years after Walker
was hired as News Director.  As News Director, Walker hired Scott
and five of the other plaintiffs in this case.  In early January
1998, Land reassigned Walker from News Director to Executive
Producer; Walker was then terminated by Land in February 1998.
Walker was replaced as News Director by white individuals (Toney,
Blinke, Johnson, and Carpenter-Johnson).
    Scott provides a great deal of "background" regarding Willy
Walker in his brief, including allegations that Harrod undermined

6

culmination of an effort begun in late 1997 to improve ratings.

The Station's news programs were relaunched in a new and unique

format.[3]  Eric Land has been President and General Manager of

WBMG-TV/WIAT since March 25, 1997.  Susan Ellenburg is Land's

Executive Assistant and the Station's Human Resources

Coordinator.

In January of 1998, during the transition period and before

_____

Walker's authority as News Director, that Broome told Walker that
every other employee she hired was to be black, that  Walker was
accused of hiring too may black employees, that Walker and Broome had
difficulty working together due to Walker's race, and that
the Station did not comply with certain aspects of the NAACP
settlement.  Walker is not a plaintiff in this action, and these
"background" allegations do not involve Land, Johnson, or other
decisionmakers who were involved in the conduct upon which
Plaintiff Scott's disparate treatment claims are based.
    In July of 1996, the Station hired an independent consulting
firm to survey its employees; the results of the survey indicated
the presence of racial issues among some Station employees, e.g.,
"hire people for their skills and talent and not their sex or
race!"  The survey was conducted prior to Defendant's purchase of
the Station and prior to Plaintiff's employment with the Station.
Any claims against Station management at that time are now time-
barred.

    [3]  The evidence in this case indicates that the relaunch
period was somewhat turbulent and created some degree of general
confusion and unrest at the Station during the transition period.
For example, there was a great deal of employee turnover
associated with the new format, a format which was completely new
and different from that of any other station.  At times, there
were personnel shortages in certain areas, which required extra
responsibilities on the part of some employees.  (See Johnson
decla. ¶ 35; Scott dep. 344-46; Porter dep. 463).

the Station was relaunched, Plaintiff interviewed with then-News Director Willy Walker.  Walker offered an off-camera reporter position to Plaintiff, which he later accepted by phone within one week following his interview.  He began work at the Station as a reporter on February 2, 1998.

At no time during Plaintiff's employment did he have a written employment contract.  He did not receive a 45-day evaluation but did receive a probationary period progress report around the 90th day of his employment.  Plaintiff received on the job feedback such as rewrites on his scripts.  Micah Johnson, News Director, terminated Plaintiff's employment on May 1, 1998, prior to the end of his 90-day probationary period, for deficient performance.  Plaintiff and his wife moved to Birmingham from Mobile after Plaintiff's employment at the Station had been terminated.

Plaintiff filed an EEOC Charge on October 28, 1998 alleging wrongful termination, a racially hostile work environment, and discriminatory practices.  (Def. Exh. 16-A, Scott EEOC Charge (Oct. 28, 1998)).

### IV. Applicable Substantive Law and Analysis

Plaintiff claims disparate treatment racial discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of

8

1964, 42 U.S.C. § 2000e et seq..  Section 1981 provides that:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens,
> and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a) (1994).  The same framework long used to

analyze claims under Title VII is also employed in assessing

claims of employment discrimination under § 1981.  See Standard

v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)

("Both of these statutes [Title VII and section 1981] have the

same requirements of proof and use the same analytical framework,

therefore we shall explicitly address the Title VII claim with

the understanding that the analysis applies to the § 1981 claim

as well.").  The Court is aware that the summary judgment rule

applies in job discrimination cases just as in other cases.  See

Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general

rule and emphasizing that no thumb is to be placed on either side

of the scale).

The analysis of the plaintiff's claims will be determined

not only by the nature of the allegations but also by the quality

of the evidence offered in support of those claims.  See

9

Standard, 161 F.3d at 1330 (noting that "[t]he analytical
framework and burden of production var[y] depending on the method
of proof chosen").  In general, a plaintiff may attempt to
establish a claim of illegal employment discrimination through
the use of direct evidence, circumstantial (indirect) evidence,
or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d
1257, 1266 (11th Cir. 1999) (recognizing the availability of
either direct or circumstantial evidence).  A plaintiff's ability
to proceed through the use of circumstantial evidence of
discrimination is necessarily important because direct proof of
discrimination is uncommon.  See Combs v. Plantation Patterns,
106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals
Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is
"[s]uch evidence [which], if believed, proves the existence of a
fact in issue without inference or presumption." Burns v.
Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).
Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir.
1999) (per Tjoflat, J.) (defining direct evidence as "evidence
from which a reasonable trier of fact could find, more probably
than not, a causal link between an adverse employment action and
a protected personal characteristic" and finding the outcomes
reflected in prior case law consistent with that definition); see

also <u>Bass v. Board of County Commissioners, Orange County,</u>

<u>Florida</u>, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning

of "direct evidence" in the context of a Title VII race

discrimination claim; "direct evidence" refers to a type of

evidence which, if true, would require no inferential leap in

order for a court to find discrimination."). However, direct

evidence does not include "stray remarks in the workplace" or

"statements by nondecisionmakers" or "statements by

decisionmakers unrelated to the decisional process itself."

<u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277 (O'Connor, J.,

concurring) (1989);  <u>see also</u> <u>EEOC v. Alton Packaging Corp.</u>, 901

F.2d 920, 924 (11th Cir. 1990) (quoting <u>Price Waterhouse</u>).

    Here, plaintiff has presented only circumstantial evidence

of racial discrimination.[4] "In evaluating [discrimination]

---

    [4]  Plaintiff has made allegations regarding (1) a two-word
office-wide e-mail (sent four months after Scott's termination)
that read: "f------ n------" (Def. Exh. 2, D0017); and (2)
comments (made to or overhead by Willy Walker, who is not a
plaintiff in this action) regarding "spade work" (which Walker
considered to be racially derogatory); whether a newly hired
anchor was "dark enough" so that viewers would know he was black;
and that the "newsroom was getting too dark."  Other than the
"spadework" comment ("spadework" is defined as work done with a
spade (digging implement) or the hard preliminary drudgery of an
undertaking, <u>Merriam Webster's</u> <u>Collegiate Dictionary</u> 1125-26 (5th
ed. 1996)), these statements were inappropriate and
unprofessional, but collectively they do not constitute direct
evidence of racial discrimination or racially hostile work

claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411

---

environment. Rather, they are examples of "stray remarks," unconnected with the decision making process, which do not rise to the level of direct evidence.

Also, Plaintiff has made allegations with regard to a conversation between co-plaintiff Cassandra Porter and then-Executive Producer, John Mecham, as to why Asher Golden, a white, male reporter, was sent to do live coverage rather than Plaintiff Scott. Plaintiff has not alleged personal knowledge of this conversation. Furthermore, there is no evidence that this conversation, or the decision to send Golden to cover the story, was in any way related to Scott's race. Porter's opinion about whether she could understand Scott is irrelevant, because it is undisputed that Porter was not a decisionmaker in the alleged conduct upon which Plaintiff Scott's claims are based.

Furthermore, Plaintiff has made general allegations about the number of African Americans hired at the Station and about the Station's EEO Plan prior to plaintiff's employment; Plaintiff has not provided any statistics from which he attempts to establish racial discrimination, and the Court will therefore not address this method of proving a prima facie case of discrimination.

Plaintiff has alleged that Micah Johnson threatened employees with a list of the names of employees who were allegedly on the bubble, in terms of job performance, and would be punished for not improving their work performance. Although Plaintiff believes that the list contained only names of black employees, neither Plaintiff Scott nor any of the co-plaintiffs Scott cites (Underwood, Freeman, and Porter) ever saw the alleged list, knows what names were on the alleged list, nor has provided evidence of race discrimination related to "the list." (Scott dep. 649-52, 658, 667). Defendant denies the existence of any such list. (Johnson decla. ¶ 11). Furthermore, two employees, John Ehrhart and Holley Ford, testified that the never heard Johnson mention this "list" in the post-show meetings. (See Ehrhart decla. ¶ 6; Ford dep. 63).

U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas</u>
<u>Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S.
Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527.
Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff
first has the burden of establishing a prima facie case of
discrimination, which creates a rebuttable presumption that the
employer acted illegally. <u>See id.</u> at 1527-28. The methods of
presenting a prima facie case, as well as the exact elements of
the case, are not fixed; rather they are flexible and depend to a
large degree upon the facts of the particular situation. <u>See,</u>
<u>e.g., Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181,
1185 (11th Cir. 1984); <u>Lincoln v. Board of Regents of Univ. Sys.</u>,
697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff
establishes a prima facie case of disparate treatment employment
discrimination by showing that he or she was a qualified member
of a protected class and was subjected to an adverse employment
action but that otherwise similarly situated employees outside
the plaintiff's class were treated dissimilarly.[5] <u>See McDonnell</u>

---

[5] <u>See also McDonnell Douglas</u>, 411 U.S. at 802 n.13 ("The
facts necessary will vary in Title VII cases, and the
specification above of the prima facie proof required from
respondent is not applicable in every respect in different
factual situations.").

Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d
1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d
at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch.
Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and,
thereby, has raised the presumption of discrimination, the burden
of production shifts to the employer to articulate a legitimate,
nondiscriminatory reason for its actions.[6] See Combs, 106 F.3d
at 1528. The employer "need not persuade the court that it was
actually motivated by the proffered reasons." Burdine, 450 U.S.
at 254-55; see Chapman, 229 F.3d at 1024. If the employer
satisfies that burden by articulating one or more such reasons,
then the presumption of discrimination falls and the burden of
production again shifts to the plaintiff to offer evidence
sufficient for a reasonable jury to conclude that the employer's
supposedly legitimate reason is merely a pretext for illegal
discrimination.[7] Where the defendant articulates multiple,

_____

[6] See Chapman, 229 F.3d at 1032 (A subjective reason is a
legally sufficient, legitimate, nondiscriminatory reason if the
defendant articulates a clear and reasonably specific factual
basis upon which the employer based its subjective opinion.).

[7] If the proffered reason is one that might motivate a
reasonable employer, a plaintiff cannot recast the reason but
must meet it head on and rebut it. Simply quarreling with that

14

reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 29 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.

---

reason is not sufficient.  Chapman, 229 F.3d at 1030.

See <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 120 S. Ct. 2097,

2108-09 (2000) (pointing out that the production of the necessary

sufficient evidence by plaintiff will not always prevent the

employer from prevailing on a Rule 50 motion and suggesting that

the strength of plaintiff's prima facie case, the probative value

of the proof that the employer's explanation is false, and any

other properly considered evidence that supports the employer's

case are among other factors to take into account in evaluating a

Rule 50 motion);[8] <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502

(1993); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000);

<u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000);

<u>Combs</u>, 106 F.3d at 1529-38 (interpreting <u>Hicks</u> and the post-<u>Hicks</u>

case law); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913,

920-21 (11th Cir. 1993).

Plaintiff alleges disparate treatment race discrimination

based upon two adverse employment actions: the termination of his

employment and disparate pay.[9]  (Pl.'s Br. Opp'n Summ. J. 9,

---

[8] The court in <u>Chapman</u> modified the statement in <u>Combs</u>
contrary to this holding in <u>Reeves</u> after noting that the standard
for granting summary judgment mirrors the standard for judgment
as a matter of law.  <u>See</u> <u>Chapman</u>, 229 F.3d at 1025, n.11.

[9]  Scott makes other allegations regarding opportunities to
serve as a back-up anchor, an increase in pay after six months, a
clothing allowance, and business cards, which he was allegedly

16

promised by Walker during his employment interview, and allegations regarding failure to receive performance evaluations. Scott has failed to provide evidence to show that these items constituted a "serious and material change in the terms, conditions, or privileges of his employment," Davis v. Town of Lake Park, Fla., No. 00-10305, 2001 WL 289882, at *7 (Mar. 26, 2001); see also Scott v. MG Broadcasting, No. CV99-H-1276-S (Order & Accompanying Memorandum of Decision) (Dec. 19, 2000), and has also failed to demonstrate a comparator with regard to these allegations. See Scott dep. 302-03 ("Q. . . . Now are you saying other employees were receiving forty-five and ninety-day evaluations and you were not? A. No sir, I'm just saying that I did not. Q. Do you think that the reason that you didn't receive an evaluation at forty-five and ninety days is because you're black? A. No sir. I didn't say that I believe I didn't receive it because I was black. I can only say that I believe I did not receive an evaluation was because I was being sectioned out for being put out.").

Scott's argument with regard to employment contracts is unclear. It is not clear whether Scott is arguing disparate treatment on employment contracts as a separate adverse employment action or whether this argument is intended to show pretext with regard to his termination claim. (See Pl.'s Br. Opp'n Summ. J. 10-13, 16). Assuming that Plaintiff Scott is arguing that failure to provide him a written employment contract constituted an adverse employment action, the Court finds that Plaintiff has failed to establish a prima facie case of disparate treatment based upon employment contracts.

In ruling on Plaintiff's fraud and breach of contract claims which were also based (in part) on failure to provide Plaintiff Scott with a written employment contract, the Court found that Plaintiff's employment with Defendant was at all times terminable at will; thus the alleged oral promise of such contract at the time of Plaintiff's interview was an unenforceable executory promise because the alleged underlying employment contract was unenforceable by Plaintiff. See Scott v. MG Broadcasting, No. CV99-H-1276-S (Order & accompanying Memorandum of Decision at 28-29) (Dec. 19, 2000). The Court also held that Plaintiff failed to establish a prima facie case of fraud because (1) he failed to show that the alleged representation of an employment contract (and other alleged terms of Plaintiff's employment) made at the

18).  Defendant argues that Plaintiff's claims are time barred
———————————

time of Plaintiff's interview were made with a present intent to
deceive and a present intent not to perform; and (2) he failed to
demonstrate that he reasonably relied on the alleged
misrepresentations.  See id. at 20-24; Royal Insur. Co. v. Latin
Am. Aviation Servs., 210 F.3d 1348, 1350 (11th Cir. 2000) (law of
the case doctrine); United States v. Escobar-Urrego, 110 F.3d
1556, 1560 (11th Cir. 1997).  Plaintiff has failed to show that
failure to provide him a written employment contract constituted
a "serious and material change in the terms, conditions, or
privileges of his employment."  Davis, No. 00-10305, 2001 WL
289882, at *7.

      Furthermore, Plaintiff has failed to demonstrate a
comparator who was similarly situated in all relevant aspects but
was treated more favorably with respect to a contract.  Plaintiff
offers Golden and Hauck as comparators with regard to employment
contracts.  Aside from the fact that Hauck held a different
position than Plaintiff (discussed more fully in the text infra
at 25-26), the evidence shows that Hauck and Golden received
contracts after a period of probationary employment with the
Station and that Hauck and Golden were not criticized for
deficient performance (but instead were praised), while
Plaintiff's work was criticized and he was terminated before the
end of his probationary period for deficient performance.  See
Scott dep. 267, 269, 387, 402, 405-06, 680, 684-85, 695-96;
Underwood dep. 606-09, 611-14.  Plaintiff acknowledged that
whether he kept his job was based on his performance, see Scott
dep. 607, and Plaintiff testified that he believed he was not
considered an "adequate" reporter.  Id. 387.  Plaintiff's
subjective view that he should have had a contract because of his
experience in the industry (relative to Golden and Hauck's
experience) is irrelevant, because Plaintiff has failed to
provide evidence that Golden and Hauck were proper comparators in
all relevant respects, and Plaintiff has failed to provide any
evidence that his not receiving an employment contract was in any
way motivated by race.  See, e.g.,  Scott dep. 386-91, 399-400,
429.  The Court also notes that, although Plaintiff alleges that
Land approved the contract, Plaintiff testified that he never
asked or attempted to ask Land about the contract; he has
testified that he does not believe Land (or Walker, who allegedly
promised him a written contract) discriminated against him.  See
Scott dep. 208-09, 246, 284-85.

under Title VII; that Plaintiff's disparate treatment claims are
precluded based on this Court's prior findings; and that
Plaintiff has failed to establish a prima facie case for lack of
a comparator or, alternatively, has failed to rebut as pretext
the Station's legitimate, nondiscriminatory reasons for the
employment decisions at issue.  Plaintiff maintains that his
claims are not time-barred; that he has established a prima facie
case; and that he has demonstrated that Defendant's proffered,
nondiscriminatory reasons are pretextual, based on performance
evaluation and employment contracts, so that genuine issues of
material fact exist for trial.  The Court finds that Defendant is
entitled to summary judgment in its favor as to all of
Plaintiff's disparate treatment race discrimination claims for
the reasons set forth herein.

It is undisputed that Plaintiff was a member of a protected
class.  The parties dispute whether Plaintiff was treated less
favorably than a similarly situated white employee and whether
Plaintiff's claims are time-barred under Title VII.

Under the 180-day statute of limitations of Title VII,
alleged acts of discrimination occurring prior to May 1, 1998 are

time-barred under Title VII.[10]  The termination of Plaintiff's

employment occurred on May 1, 1998 and thus would fall within

Title VII's statute of limitations.  Plaintiff has not provided

evidence of a continuing violation so as to qualify for an

exception to the 180-day limit.[11]  See Carter v. West Publishing

Co., 225 F.3d 1258, 1263-64 (11th Cir. 2000); Roberts v. Gadsden

Memorial Hosp., 850 F.2d 1549, 1550 (11th Cir. 1988); Berry v.

Louisiana State Univ. Bd. of Supervisors, 715 F.2d 971, 981 (5th

Cir. 1983).  However, the entire period of Plaintiff's employment

falls within the two-year statute of limitations of § 1981;[12]

thus, Plaintiff's claims would not be time-barred under § 1981.

---

[10]  Plaintiff's EEOC Charge was filed on October 28, 1998.

[11]  Plaintiff's only argument of continuing violation is
that he was promised an employment contract, and the first time
he realized that he was not going to receive a written employment
contract was on May 1, 1998, the day of his termination.  (See
Pl.'s Br. Opp'n Summ. J.  7-8).  This argument is contrary to
Plaintiff's deposition testimony (see Scott dep. 249-50
(testifying that Plaintiff realized by Friday of his first week
of employment with the Station that he was not going to get a
contract)) and to the law of this case established by the Court's
December 19, 2000 Order.  Scott v. MG Broadcasting, No. CV99-H-
1276-S (Order) (Dec. 19, 2000) (granting summary judgment in
favor of Defendants as to Plaintiff Scott's fraud and breach of
contract claims).

[12]  Plaintiff's Complaint was filed on May 20, 1999; he was
employed with the Station from February of 1998 through May of
1998.

20

Plaintiff argues that he was treated less favorably than
Stephen Hauck and Asher Golden with regard to his termination
because both Hauck and Golden were given contracts of employment.
(Pl.'s Br. Opp'n Summ. J. 9).  Plaintiff argues that Defendant's
articulated reasons for terminating Plaintiff are pretextual,
because (1) his performance was never evaluated, and he received
no constructive feedback (while Asher Golden allegedly received
constructive comments); (2) Golden and Ashley Risk were not
required to complete a ninety-day probationary period before
receiving an employment contract; (3) Golden's employment was
continued even though he was a "bag of problems" while Plaintiff
was terminated for deficient performance; and (4) Defendant did
not follow its policies and procedures with regard to evaluation
on Plaintiff's 45th day of employment.  Plaintiff also relies on
testimony of Land with regard to which employees were being
offered contracts at the time of the Station's relaunch.

Defendant argues that Golden and Hauck are not proper
comparators, because they are not similarly situated in all
relevant respects to Plaintiff:  (1) Hauck was in a completely
different position as a "one man band"; (2) Hauck and Golden were
each offered an employment contract after a period of
probationary employment with the Station; (3) neither Golden nor

21

Hauck was the subject of a negative performance evaluation or post-show meeting criticisms, as Scott was, but consistently performed well in their positions. (Def.'s Reply Br. 4). Furthermore, Defendant asserts that Plaintiff has failed to rebut the Station's legitimate and nondiscriminatory reasons for his termination: that Scott was a probationary employee whose performance was reviewed by Johnson and found to be consistently deficient. Defendant denies that Golden's employment was continued despite deficient performance and maintains that the documents cited by Plaintiff do not relate to deficient performance on the part of Golden, but rather relate to events concerning Golden's separation from employment. Defendants also argue that Plaintiff cannot compare himself to Ashley Risk with regard to employment contracts, because even if Risk was offered an employment contract when she was hired, in the summer of 1998, this was after Scott had been terminated and was several months after the relaunch, which was the period of time Land specifically testified to in the testimony relied on by Plaintiff.[13]

Plaintiff has failed to establish a prima facie case with

---

[13] <u>See</u> Land dep. 359-60.

regard to the termination of his employment and has provided no
evidence that the termination of his employment was motivated by
intentional race discrimination.  The evidence shows that
Plaintiff's employment was terminated based on deficient
performance and that his performance was criticized on numerous
occasions prior to his termination in the form of rewrites of his
scripts and verbal criticism at post-show meetings and otherwise.
(See supra note 9; see also Scott v. MG Broadcasting, No. CV99-H-
1276-S (Order & accompanying Memorandum of Decision) (Dec. 19,
2000).  Plaintiff has not provided evidence of a comparator who
was repeatedly criticized for deficient performance and yet
retained; there is no evidence that the performance of
Plaintiff's proffered comparators (Golden and Hauck) was
deficient.  Rather, the evidence shows that Golden and Hauck were
praised for their performance.[14]  Plaintiff bears the burden of
proof on his disparate treatment claims and has failed to come

---

[14]  Plaintiff argues that Golden was a "less than exemplary"
employee based on e-mails from Land regarding problems the
Station had experienced with Golden.  However, the evidence shows
that Station management was "impressed" with Golden's performance
and instead had problems relating to Golden's conduct in refusing
to sign the employment contract offered to him and in causing
morale problems among other employees.  (See E-mail message from
Micah Johnson to Eric Land, D1261-62; E-mail message from Eric
Land to Deborah Mobley and Susan Ellenburg, D1261-62).

forward with evidence sufficient to establish his case.
Defendant is therefore entitled to summary judgment in its favor
with regard to Plaintiff's disparate treatment termination
claims.

Plaintiff argues that he was paid less than white employees
Hauck and Golden for performing the same job, despite the fact
that he had several more years experience than either Hauck or
Golden.[15]  (Pl.'s Br. Opp'n Summ. J. 18).

Defendant argues that Scott has introduced no evidence that
he was dissatisfied with the salary he accepted from Walker, that
he attempted to negotiate a higher salary with Walker, or of how
the salaries of Hauck and/or Golden were negotiated (by agent or
otherwise).  Defendant also argues that Walker was the one who
made the salary offer which Scott voluntarily agreed to accept
and that Plaintiff has made no claims that Walker made any
misrepresentations to him or discriminated against him.
Defendant points out that Plaintiff testified that his salary

---

[15]  Plaintiff's salary from February 1998 through May 1998
was $23,500 plus overtime. Hauck's salary was $26,000 in February
1998 and was raised to $27,100 in July of 1998; Hauck was offered
a contract guaranteeing him a raise to $28,200 in December 1999.
Golden's salary from April 1998 to June 1998 was $28,000.  As a
free-lance reporter from February 1998 to April 1998, Golden's
salary was $12.00 per hour.

could get as high as $30,000 per year if he successfully completed a probationary period.  (Scott dep. 224, 783-85).

Plaintiff has failed to establish his disparate pay claim and has provided no evidence that the employment decision regarding his pay was motivated by intentional race discrimination.

Plaintiff attempts to compare himself to employees in two different jobs:  reporter (Golden) and one-man band (Hauck).  In order to show a prima facie case of disparate pay, Plaintiff must provide a meaningful comparison between white and black employees who held the <u>same jobs</u> with <u>comparable duties and responsibilities</u>.  <u>See Morgan v. City of Jasper</u>, 959 F.2d 1542, 1545 (11th Cir. 1992); <u>see also Pittman v. Hattiesburg Mun. Separate Sch. Dist.</u>, 644 F.2d 1071, 1074 (5th Cir. 1981) (comparing black and white employees, employed at the same time (or a predecessor/successor in same job) and doing substantially the same work).[16]  The evidence shows, and Plaintiff has

---

[16]   In order to establish a prima facie case of disparate treatment, a plaintiff must show a comparator who is "similarly situated in all relevant aspects."  <u>Silvera v. Orange County School Board</u>, No. 99-15318, 2001 WL 273853, at *4 (11th Cir. Mar. 20, 2001).  For example, in the disciplinary context, "the comparator's misconduct must be <u>nearly identical</u> to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with

consistently maintained, that Plaintiff was employed with

Defendant as an off-camera reporter, not as a one-man band.[17]

(See Scott dep. 265, 506-08).  Therefore, Hauck is not a proper

comparator for Plaintiff's disparate pay claim because he did not

hold the same job.[18]

––––––––––––––––––

oranges.'"  Id. (citing Maniccia v. Brown, 171 F.3d 1364, 1368-69
(11th Cir. 1999) (emphasis added).  "If a plaintiff fails to show
the existence of a similarly situated employee, summary judgment
is appropriate where no other evidence of discrimination is
present."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.
1997).

     [17] Defendant argues that Plaintiff's termination form
mistakenly listed him as a one-man band.  This evidence is
insufficient to demonstrate that Plaintiff in fact held the
position, duties, and responsibilities of a one-man band during
his employment with the Station in light of the overwhelming
evidence, including Plaintiff's own testimony, that he was in
fact a reporter.

     [18] A one-man band is a combination of a reporter and
photographer; although Plaintiff Scott, Golden, and Hauck all
performed "reporter" duties to some extent, comparing Plaintiff
to Hauck is problematic in that Hauck's job involved additional
duties and responsibilities as a photographer, which Plaintiff
did not have.  Furthermore, there is evidence that Hauck did more
shooting video than interviewing witnesses (reporting).  See
Johnson decla. ¶ 20; see also Hodgson v. American Bank of
Commerce, 447 F.2d 416 (5th Cir. 1971) (holding that it was
impossible to compare employee engaged in both bookkeeping and
drive-in teller duties to either bookkeepers or tellers); Brennan
v. Victoria Bank & Trust Co., 493 F.2d 896 (5th Cir. 1974)
(holding that difference in pay was validated where evidence
showed that duties of exchange teller were more complicated and
resulted in greater chance of loss to bank than duties of note
tellers, though on some occasions note tellers would carry on
exchange tellers' functions).

Even assuming that both Hauck and Golden are proper
comparators, Defendant has asserted that the difference in
salaries is due to the fact that Golden and Hauck successfully
negotiated higher salaries with the Station than Plaintiff did
upon accepting employment;[19] it is undisputed that Plaintiff
voluntarily accepted the $23,500 offered to him by Walker.
Plaintiff has not come forth with any evidence to rebut this
legitimate and nondiscriminatory reason.  Plaintiff argues that
he had more experience than Golden (and Hauck); however,
Defendant has never maintained that the reason for the difference
in pay was due to experience.  Plaintiff is required to meet head
on and rebut Defendant's articulated reason; Plaintiff may not
recast Defendant's reason, and simply quarreling with Defendant's
reason is insufficient.  See Chapman, 229 F.3d at 1030.  In
addition, it is undisputed that Plaintiff's salary could have
gone up to $30,000 (more than Golden or Hauck's salary) had he

_____

[19]   Furthermore, both as a practical matter and also as
shown by the evidence in this case, employees at the Station were
allowed to and did in fact negotiate certain terms and conditions
of their employment up front before beginning employment with the
Station, and decisions regarding terms and conditions of a
particular employee's employment at the Station were made on a
case by case basis.  (See, e.g., Ellenburg dep. 48; WIAT's Ans.
to Pl.'s Interrog. No. 12).

successfully completed his probationary period.  As with Plaintiff's termination claim, Plaintiff bears the burden of proof on his claims of disparate pay and has failed to come forward with evidence sufficient to establish his case. Defendant is therefore entitled to summary judgment in its favor with regard to Plaintiff's disparate pay claims.

In summary, the Court finds that no material issues of fact remain and that Defendant MG Broadcasting is entitled to judgment as a matter of law as to all Title VII and § 1981 racial discrimination disparate treatment claims asserted against it by Plaintiff Scott.  A separate order will be entered.

DONE this __21^st__ day of May, 2001.

SENIOR UNITED STATES DISTRICT JUDGE

28