IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 JUN 11 PM 1: 29

U.S. DISTRICT COURT
N.D. OF ALABAMA

AIMEDRA O. KELLEY,      )

    PLAINTIFF,      )

VS.      )      CV-99-H-1276-S

MG BROADCASTING OF      )
BIRMINGHAM, INC., d/b/a
WIAT-TV, corporation,      )

    DEFENDANT.      )

**ENTERED**

JUN 1 1 2001

## MEMORANDUM OF DECISION

The Court has before it the September 6, 2000 motion of Defendant MG Broadcasting of Birmingham, Inc. for summary judgment in its favor with regard to the claims of Aimedra O. Kelley against it under Title VII (Count One) and Section 1981 (Count Two). Pursuant to this Court's Order entered March 19, 2001 (Document No. 173), the motion for summary judgment as to such claims is now under submission. The parties have presented to the Court evidence in support of and in opposition to the motion, as well as briefs addressing the issues now under submission.

### I. Procedural History

Plaintiff Kelley and six other plaintiffs commenced this

action May 20, 1999 asserting a variety of claims against MG Broadcasting, Land, and Media General, Inc.   Media General was dismissed with prejudice by the November 2, 2000 order (Document Number 115).   Conversion and defamation claims (Counts Seven and Eight respectively) by two of the plaintiffs were dismissed September 11, 2000 (Document Number 92).   Following extended discovery the remaining two defendants filed motions for summary judgment on September 6, 2000 with regard to all remaining claims asserted by the plaintiffs.   The Court has entered summary judgment in favor of defendants as to all plaintiffs' claims under Count Three (Equal Pay Act), Count Four (breach of contract), Count Five (fraud), and Count Six (fraudulent suppression).   The Court has entered summary judgment in favor of defendant as to racial discrimination disparate treatment and constructive discharge claims of all plaintiffs other than Kelley under Count One (Title VII) and Count Two (§ 1981).   The submission order entered on March 19, 2001 is applicable to the claims which are the subject of this memorandum of decision. Plaintiff's only claims in this action are her claims of disparate treatment race discrimination, constructive discharge, and racially hostile work environment under Title VII and Section 1981.   Plaintiff's disparate treatment and constructive discharge

2

claims are the subject of this memorandum of decision.  Her

hostile work environment claims, along with similar claims of the

other six plaintiffs in this case, will be the subject of a

separate memorandum of decision.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary

judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment

as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir.

2000)  The party asking for summary judgment always bears the

initial responsibility of informing the court of the basis for

its motion and identifying those portions of the pleadings or

filings which it believes demonstrate the absence of a genuine

issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once

the moving party has met his burden, Rule 56(e) requires the

nonmoving party to go beyond the pleadings and by his own

affidavits, or by the depositions, answers to interrogatories,

and admissions of file, designate specific facts showing that

there is a genuine issue for trial.  Id. at 324.

3

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the

4

burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record

5

evidence, overlooked or ignored by the movant, sufficient to
withstand a directed verdict, or the non-moving party may come
forward with additional evidence sufficient to withstand a
directed verdict motion at trial based on the alleged evidentiary
deficiency.  However, when responding, the non-movant can no
longer rest on mere allegations, but must set forth evidence of
specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing
Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts

Defendant MG Broadcasting of Birmingham, Inc. owned the
assets of WIAT-TV ("the Station") at all times material to this
action.[1]  The Station was relaunched in February 1998, the

---

[1]  In 1992, several years prior to Defendant's purchase of
the Station, the National Association for the Advancement of
Colored People ("NAACP") filed a petition to block the renewal of
the Station's FCC license for alleged failure to comply with the
FCC's equal employment opportunity rules.  Thereafter, the
Station and the NAACP entered into a settlement agreement on
December 7, 1994, which provided, among other things, that the
Station would take several affirmative steps to diversify its
workforce.  The agreement was to expire "no later than April 1,
2000" and expressly stated that it ran with the license and would
be assigned to any new owner of the station in the event of a
sale during the term of the agreement.  At the time of these
events, the Station's General Manager was Hoyle Broome, and the
News Director was John Harrod, both of whom are white.  In
December 1995, one year after the settlement agreement was
signed, Broome hired Willy Walker, an African-American female, to
replace John Harrod as News Director, although Harrod remained
employed at the Station as a reporter for two years after Walker

culmination of an effort begun in late 1997 to improve ratings.

The Station's news programs were relaunched in a new and unique

format.[2]  Eric Land has been President and General Manager of

---

was hired as News Director.  As News Director, Walker hired Scott
and five of the other plaintiffs in this case.  In early January
1998, Land reassigned Walker from News Director to Executive
Producer; Walker was then terminated by Land in February 1998.
Walker was replaced as News Director by white individuals (Toney,
Blinke, Johnson, and Carpenter-Johnson).

   Kelley provides a great deal of "background" regarding Willy
Walker in her brief, including allegations that Harrod undermined
Walker's authority as News Director, that Broome told Walker that
every other employee she hired was to be black, that  Walker was
accused of hiring too may black employees, that Walker and Broome
had difficulty working together due to Walker's race, and that
the Station did not comply with certain aspects of the NAACP
settlement.  Walker is not a plaintiff in this action, and these
"background" allegations do not involve Land, Johnson, Ehrhart,
or other decisionmakers who were involved in the conduct upon
which Plaintiff Kelley's disparate treatment claims are based.

   In July of 1996, the Station hired an independent consulting
firm to survey its employees; the results of the survey indicated
the presence of racial issues among some Station employees, e.g.,
"hire people for their skills and talent and not their sex or
race!"  The survey was conducted prior to Defendant's purchase of
the Station and prior to Plaintiff's employment with the Station.
Any claims against Station management at that time are now time-
barred.

   [2]  The evidence in this case indicates that the relaunch
period was somewhat turbulent and created some degree of general
confusion and unrest at the Station during the transition period.
For example, there was a great deal of employee turnover
associated with the new format, a format which was completely new
and different from that of any other station.  At times, there
were personnel shortages in certain areas, which required extra
responsibilities on the part of some employees.  (See Johnson
decla. ¶ 35; Parker dep. 65, 69, 83; Scott dep. 344-46; Porter
dep. 463).

WBMG-TV/WIAT since March 25, 1997.  Susan Ellenburg is Land's Executive Assistant and the Station's Human Resources Coordinator.  During Plaintiff's employment with the Station, four different individuals successively held the position of News Director: Willy Walker, Mark Toney, Al Blinke, and Micah Johnson.

Plaintiff began employment with the Station on October 6, 1997 as a part-time weekend assignment editor.[3]  Plaintiff was hired by then-News Director Willy Walker at a wage of $7.00 per hour, the maximum wage within the salary range for this position. (See Personnel/Payroll Change Notice (Kelley), D00094).  In Plaintiff's interview, Plaintiff informed Walker that Plaintiff would be getting married and would need time off; according to Plaintiff, Walker assured Plaintiff that she would be advanced vacation time for her wedding and honeymoon.  (Kelley dep. 117-18).  Plaintiff received nine consecutive days off for her wedding and honeymoon.  (See Parker Exh. 8, Work Schedule (Mar. 24, 1998 - March 22, 1998).  As a part-time employee, Plaintiff was paid for the hours she worked.

_____

[3]  When Plaintiff was hired in October of 1997, Plaintiff replaced co-plaintiff Violet Ruffin Parker as part-time assignment editor after Parker had been promoted to full-time assignment editor on September 24, 1997.  (Personnel/Payroll Change Form (Parker), D00380).

On December 5, 1997, Plaintiff was promoted to full-time status in the position of weekend assignment editor; her annual salary in this position was $18,000. As an assignment editor, Plaintiff's duties included: listening to police scanners, answering phones, scheduling assignments, prioritizing, and bringing up assignments at meetings. (Kelley dep. 79, 91-94; Job Posting Requisition, D00117; Ehrhart decla. ¶ 8).

On December 8, 1997, Walker hired Vanessa Flowers, a white female, for the position of Assignment Desk Assistant, a new position. Flowers began this position as a full-time employee at an annual salary of $15,000. (Personnel/Payroll Change Notice (Flowers), D1366). Assignment desk assistant responsibilities included: answering telephones, filing releases, making calls to local precincts, handling research on stories, and assisting on the assignment desk. (Job Requisition Form, D1367; Kelley dep. 94; Ehrhart decl. ¶ 9). At some point, Flowers began working fewer hours. At all times, Flowers was paid only for the hours she worked. (Johnson decla. ¶ 60). Micah Johnson, then-News Director, allowed Flowers to work fewer hours pursuant to Flowers request that she was a full-time student and needed to study. Plaintiff testified that, while there was some overlap, the job of assignment desk assistant was a different job than assignment

9

desk editor.  (Kelley dep. 79, 308).

On June 22, 1998, John Ehrhart was hired as Assignment Desk
Manager.  He was Plaintiff's direct supervisor during his
employment there until August 18, 1998 (less than two months).
(Ehrhart decla. ¶ 1, 12).

On July 7, 1998, Plaintiff asked Ehrhart for a raise.
Ehrhart did not believe Plaintiff's performance merited a raise
at that time.  (Ehrhart decla. ¶ 18).  On July 24, 1998, Ehrhart
replied that he had not been there long enough to formally
evaluate her work.[4]  (Kelley EEOC Charge (Aug. 31, 1998); Kelley
dep. 37; Ehrhart decla. ¶ 19).  Plaintiff had received a raise in
December 1997, and Plaintiff's annual review was to be in
December of 1998, one year after her promotion to full-time
assignment editor.

Holley Ford, a white female, was also employed by Defendant
as a full-time assignment editor during Plaintiff's employment
with Defendant as a full-time assignment editor.  Ford's starting
salary as full-time assignment editor was $18,000, the same as

_____

[4]  According to Plaintiff, Ehrhart initially told Plaintiff
that she was doing a good job, that she should be making more
money, and that she deserved a raise.  However, Plaintiff admits
that she may have had reason to doubt his sincerity and thought
he might be saying those things as a way to "blow [her] off."
(Kelley dep. 127-28; Kelley EEOC Charge (Aug. 31, 1998)).

Plaintiff's starting salary as a full-time assignment editor. (Johnson decla. ¶ 46). Based on what he judged to be exceptional job performance, Ehrhart recommended that Ford be given a written contract of employment and a raise.[5] Based upon Ehrhart's recommendations as Ford's direct supervisor, Johnson and Land approved this request. (Johnson decla. ¶ 15). Ford was given a written employment contract and a raise in the summer of 1998.

Ehrhart and Plaintiff had difficulty working together. Plaintiff felt that Ehrhart ignored her and was a poor communicator. (Kelley Exit Interview; Kelley dep. 126-28). Ehrhart felt that Plaintiff "displayed a poor attitude and an unwillingness to accept directives" including at least one occasion where Kelley never performed a task that Ehrhart asked her to perform (a task which Ford later performed at Ehrhart's request). Ehrhart felt that Plaintiff was generally unavailable for weekend double shifts (while Ford was willing to and did work such shifts). Ehrhart also felt that Kelley missed news stories

---

[5]   Ehrhart testified that he recommended a raise and contract for Ford because: "a.  I considered her work to be excellent; b.  She went above and beyond the call of duty; c. She was a self-started; d.  She always did what she was asked and more; e.  She always came in to fill in at the Station when asked; and f.  She never complained about working late."  Ehrhart felt that the Station should not risk losing Ford to a competing television station.  (Ehrhart decla. ¶ 14).

and did not appear to be focused on her work, which resulted in competing stations being able to report on stories that WIAT did not even know about.  (Id. ¶¶ 16-17; <u>see also</u> Ford decla. p.2).[6]

Other than Kelley's co-plaintiffs, also employed at the Station during Plaintiff's tenure of employment were Asher Golden (reporter), Stephen Hauck (one man band), and Ashley Risk (reporter).

On August 6, 1998, approximately two weeks prior to Plaintiff's resignation, Debbie Mobley and Rick Roberts of Media General Human Resources were at the Station investigating a sexual harassment allegation relating to another female employee. At this time, Plaintiff complained to Mobley of race discrimination.  (Mobley decla. ¶ 4).  This was Plaintiff's first complaint of race discrimination. (Kelley dep. 142).  Mobley told Plaintiff that she would investigate the matter.  Mobley and Roberts performed an  investigation and concluded that the

---

[6]  Ford testified as follows:  "I was surprised to see Aimedra ignore [Ehrhart's] instructions or resist complying on a number of occasions.  For example, on one occasion, John, Aimedra, and I were sitting at the assignment desk with Aimedra between John and me.  I observed and could hear John ask Aimedra to do a certain task, and she ignored him and did not do the task.  I feel certain that Aimedra heard John's instructions because I could hear him and she was sitting closer to him." (Ehrhart decla. p.2).

employment decisions challenged by Plaintiff were motivated by legitimate business reasons.  (Mobley decla. ¶¶ 5-7; Roberts decla. ¶¶ 10-12; Ellenburg dep. 62-63; Land dep. 399; Memorandum from Rick Roberts to Bill Diaz (Sept. 24, 1998), D0904).

Plaintiff submitted her resignation on August 17, 1998, stating that she was leaving employment at the Station to pursue other opportunities.  Her last day of employment at the Station was August 31, 1998.  (Letter of Resignation, D00105).  Plaintiff typed an  exit interview form on which she stated (1) that her reason for leaving was that she had been discriminated against and had no room for advancements; (3) that her salary was inadequate, and she had been told by Ehrhart that her salary was "way below what [she] should be making in [her] position"; (3) that her supervisor, Ehrhart, had "absolutely no management skills.  He is an ineffective, inadequate communicator. His people skills are poor"; (4)  that the work environment at the Station was such that "the company will never be able to maintain loyal, competent employees.  Morale is at an all-time low.  Many will follow."  Plaintiff stated "no comment" with regard to working conditions.  (Employee Exit Interview (Kelley), D00115).

Roberts contacted Plaintiff on September 23, 1998 to discuss her resignation and also inquired as to whether there was any

possibility of her returning to her position at the Station since
John Ehrhart was gone.  Plaintiff had no further communications
with Mobley and Roberts after this time.  (Roberts decla. ¶ 14).

Plaintiff filed an EEOC Charge on August 31, 1998 in which
she alleged that she had been discriminated against because of
her race because a white employee with less seniority was granted
a wage increase whereas Plaintiff was not.  (EEOC Charge (Aug.
31, 1998)).

### IV. Applicable Substantive Law and Analysis

Plaintiff claims disparate treatment racial discrimination
under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq..  Section 1981 provides that:

> All persons within the jurisdiction of the United
> States shall have the same right in every State and
> Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of
> persons and property as is enjoyed by white citizens,
> and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a) (1994).  The same framework long used to
analyze claims under Title VII is also employed in assessing
claims of employment discrimination under § 1981.  See Standard
v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)
("Both of these statutes [Title VII and section 1981] have the

14

same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."). The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. <u>See</u> <u>Chapman</u>, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims. <u>See</u> <u>Standard</u>, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen"). In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. <u>See</u> <u>id.</u>; <u>see also</u> <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence). A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon. <u>See</u> <u>Combs v. Plantation Patterns</u>,

15

106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals
Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is
"[s]uch evidence [which], if believed, proves the existence of a
fact in issue without inference or presumption."  Burns v.
Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).
Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir.
1999) (per Tjoflat, J.) (defining direct evidence as "evidence
from which a reasonable trier of fact could find, more probably
than not, a causal link between an adverse employment action and
a protected personal characteristic" and finding the outcomes
reflected in prior case law consistent with that definition); see
also Bass v. Board of County Commissioners, Orange County,
Florida, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning
of "direct evidence" in the context of a Title VII race
discrimination claim; "direct evidence" refers to a type of
evidence which, if true, would require no inferential leap in
order for a court to find discrimination.").  However, direct
evidence does not include "stray remarks in the workplace" or
"statements by nondecisionmakers" or "statements by
decisionmakers unrelated to the decisional process itself."
Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J.,
concurring) (1989); see also EEOC v. Alton Packaging Corp., 901

16

F.2d 920, 924 (11th Cir. 1990) (quoting Price Waterhouse).

Here, plaintiff has presented only circumstantial evidence of racial discrimination.[7] "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.

---

[7] Plaintiff has made allegations regarding (1) a two-word office-wide e-mail (sent one month after Kelley's resignation) that read: "f------ n------" (Def. Exh. 2, D0017); and (2) comments (made to or overhead by Willy Walker, who is not a plaintiff in this action) regarding "spade work" (which Walker considered to be racially derogatory); whether a newly hired anchor was "dark enough" so that viewers would know he was black; and that the "newsroom was getting too dark."  Other than the "spadework" comment ("spadework" is defined as work done with a spade (digging implement) or the hard preliminary drudgery of an undertaking, Merriam Webster's Collegiate Dictionary 1125-26 (5th ed. 1996)), these statements were inappropriate and unprofessional, but collectively they do not constitute direct evidence of racial discrimination or racially hostile work environment.  Rather, they are examples of "stray remarks," unconnected with the decision making process, which do not rise to the level of direct evidence.

Furthermore, Plaintiff has made general allegations about the number of African Americans hired and terminated by the Station and about the Station's EEO Plan prior to plaintiff's employment; Plaintiff has not provided any statistics from which she attempts to establish racial discrimination, and the Court will therefore not address this method of proving a prima facie case of discrimination.

Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527.

Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff

first has the burden of establishing a prima facie case of

discrimination, which creates a rebuttable presumption that the

employer acted illegally. <u>See</u> <u>id.</u> at 1527-28. The methods of

presenting a prima facie case, as well as the exact elements of

the case, are not fixed; rather they are flexible and depend to a

large degree upon the facts of the particular situation. <u>See</u>,

<u>e.g.</u>, <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181,

1185 (11th Cir. 1984); <u>Lincoln v. Board of Regents of Univ. Sys.</u>,

697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff

establishes a prima facie case of disparate treatment employment

discrimination by showing that he or she was a qualified member

of a protected class and was subjected to an adverse employment

action but that otherwise similarly situated employees outside

the plaintiff's class were treated dissimilarly.[8] <u>See</u> <u>McDonnell</u>

<u>Douglas</u>, 411 U.S. at 802 (hiring); <u>Holifield v. Reno</u>, 115 F.3d

1555, 1562 (11th Cir. 1997) (discipline); <u>see also</u> <u>Nix</u>, 738 F.2d

---

[8] <u>See also</u> <u>McDonnell Douglas</u>, 411 U.S. at 802 n.13 ("The
facts necessary will vary in Title VII cases, and the
specification above of the prima facie proof required from
respondent is not applicable in every respect in different
factual situations.").

at 1185 (discipline); <u>Pittman v. Hattiesburg Mun. Separate Sch.</u>
<u>Dist.</u>, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and,
thereby, has raised the presumption of discrimination, the burden
of production shifts to the employer to articulate a legitimate,
nondiscriminatory reason for its actions.[9]  See <u>Combs</u>, 106 F.3d
at 1528.  The employer "need not persuade the court that it was
actually motivated by the proffered reasons."  <u>Burdine</u>, 450 U.S.
at 254-55; <u>see</u> <u>Chapman</u>, 229 F.3d at 1024.  If the employer
satisfies that burden by articulating one or more such reasons,
then the presumption of discrimination falls and the burden of
production again shifts to the plaintiff to offer evidence
sufficient for a reasonable jury to conclude that the employer's
supposedly legitimate reason is merely a pretext for illegal
discrimination.[10]  Where the defendant articulates multiple,
reasonable, legitimate and nondiscriminatory reasons, plaintiff

_____

[9] <u>See</u> <u>Chapman</u>, 229 F.3d at 1032 (A subjective reason is a
legally sufficient, legitimate, nondiscriminatory reason if the
defendant articulates a clear and reasonably specific factual
basis upon which the employer based its subjective opinion.).

[10] If the proffered reason is one that might motivate a
reasonable employer, a plaintiff cannot recast the reason but
must meet it head on and rebut it.  Simply quarreling with that
reason is not sufficient.  <u>Chapman</u>, 229 F.3d at 1030.

must rebut each of defendant's proffered reasons. See Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at. 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the

employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[11] <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000); <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000); <u>Combs</u>, 106 F.3d at 1529-38 (interpreting <u>Hicks</u> and the post-<u>Hicks</u> case law); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 920-21 (11th Cir. 1993).

Generally, to establish a prima facie case of constructive discharge racial discrimination, the plaintiff must show that her working conditions were "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." <u>Bourque v. Powell Elec. Mfg. Co.</u>, 617 F.2d 61, 65 (5th Cir. 1980); <u>see</u> <u>Garner v. Wal-Mart Stores, Inc.</u>, 807 F.2d 1536, 1539 (11th Cir. 1987).

---

[11] The court in <u>Chapman</u> modified the statement in <u>Combs</u> contrary to this holding in <u>Reeves</u> after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law. <u>See</u> <u>Chapman</u>, 229 F.3d at 1025, n.11.

## A.  Disparate Treatment

Plaintiff alleges disparate treatment race discrimination based upon her pay.  (Pl.'s Br. Opp'n Summ. J. 10-15).  Plaintiff alleges disparate pay with regard to (1) Flowers, assignment desk assistant, (2) Ford, assignment editor, and (3) Hauck, one-man band.  Plaintiff alleges that she was denied a raise when she was allegedly promoted (from the weekend schedule) to weekday night-side assignment editor.  Plaintiff also alleges (as evidence of pretext, not as a separate adverse employment action) that the Station discriminated against black employees with regard to written employment contracts, specifically, the employment contracts given to Golden, Ford, and Risk.

Defendant argues that Plaintiff has failed to establish a prima facie case or, alternatively, has failed to rebut as pretext the Station's legitimate, nondiscriminatory reasons for the employment decisions at issue.  Plaintiff maintains that she has established a prima facie case and that she has demonstrated that Defendant's proffered, nondiscriminatory reasons are pretextual, so that genuine issues of material fact exist for trial.  The Court finds that Defendant is entitled to summary judgment in its favor as to all of Plaintiff's disparate treatment and constructive discharge race discrimination claims

for the reasons set forth herein.

It is undisputed that Plaintiff was a qualified member of a
protected class.  The parties dispute whether some of Plaintiff's
allegations constitute adverse employment actions and whether
Plaintiff was treated less favorably than a similarly situated
white employee.[12]

In order to show a prima facie case of disparate pay,
Plaintiff must provide a meaningful comparison between white and
black employees who held the same jobs with comparable duties and

---

[12] Plaintiff's testimony shows that Ehrhart is the only
individual at the Station whom Plaintiff accuses of race
discrimination.  (Kelley dep. 48, 109, 119, 135-36, 141).
Ehrhart was only employed at the Station for approximately two
months (June 1998 - August 1998).  Kelley testified that she made
no claim of discrimination against Walker, Land, Johnson,
Ellenburg, John Mecham, or Al Blinke.  (Kelley dep. 15, 140-41).
However, some of Plaintiff's allegations are based on conduct or
decisions made prior to Ehrhart's employment at the Station; the
decisionmakers during the conduct at issue (primarily Walker) are
persons whom Plaintiff does not accuse of race discrimination.
(Id. 15, 119, 140-41).  Plaintiff testified that at the time of
these pre-Ehrhart decisions (involving Plaintiff's vacation pay
for her wedding and honeymoon and the alleged denial of a raise
when she became night-side assignment editor), she did not
conclude that the decisions were motivated by race
discrimination; but by the time she decided to leave the Station,
she included the two pre-Ehrhart decisions in her belief that she
"was basically in an environment that tolerated and promoted
racism . . . ."  (Kelley dep. 135-36).  Despite these
inconsistencies in Plaintiff's allegations, the Court will
nevertheless address all of Plaintiff's allegations herein.

responsibilities.  See Morgan v. City of Jasper, 959 F.2d 1542,

1545 (11th Cir. 1992); see also Pittman v. Hattiesburg Mun.

Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981)

(comparing black and white employees, employed at the same time

(or a predecessor/successor in same job) and doing substantially

the same work).[13]

Plaintiff argues that she was treated less favorably than

Vanessa Flowers because Flowers allegedly received full-time pay

for working part-time hours.  Kelley has admitted that Flowers

held a different, lower-level position than Plaintiff held--that

of full-time assignment desk assistant.  (Kelley dep. 308).  This

alone establishes that Flowers was not a proper comparator

because she did not hold substantially the same job.  Aside from

this fact, Plaintiff has provided no evidence of what Flowers was

---

[13]   In order to establish a prima facie case of disparate
treatment, a plaintiff must show a comparator who is "similarly
situated in all relevant aspects."  Silvera v. Orange County
School Board, 244 F.3d 1253, 1259 (11th Cir. 2001).  For example,
in the disciplinary context, "the comparator's misconduct must be
nearly identical to the plaintiff's in order 'to prevent courts
from second-guessing employers' reasonable decisions and
confusing apples with oranges.'"  Id. (citing Maniccia v. Brown,
171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis added).  "If a
plaintiff fails to show the existence of a similarly situated
employee, summary judgment is appropriate where no other evidence
of discrimination is present."  Holifield v. Reno, 115 F.3d 1555,
1562 (11th Cir. 1997).

actually paid for the work she performed (e.g., time sheets, pay
stubs, etc.).  It is undisputed that at some point Flowers began
working less than full-time hours.  However, Defendant maintains
that Flowers was paid only for hours worked;[14] Plaintiff has
provided no evidence to the contrary.  Plaintiff simply relies on
one personnel record, listing Flowers as full-time status at a
salary of $15,000, and the fact that Flowers at some point worked
less than full-time hours to attempt to establish this disparate
treatment claim.  Moreover, during the relevant time period,
Plaintiff's annual salary was $18,000 as a full-time weekend
assignment editor (beginning December 5, 1997) while Flowers'
annual salary was $15,000 as a full-time assignment desk
assistant (beginning December 8, 1997).  Plaintiff has failed to
demonstrate by substantial evidence that Flowers' $15,000 salary
as a full-time assistant was adverse to Plaintiff or comparable
to Plaintiff's salary of $18,000 as a full-time assignment
editor.[15]  Plaintiff has failed to establish a prima facie case

_____

[14]  Based on Flowers' $15,000 annual salary, her rate of pay
would be approximately $7.21 per hour (based on a 2080-hour
year.)

[15]  Plaintiff seems to argue that she should be compared as
a part-time weekend assignment editor (October 6, 1997 - December
5, 1997) to Flowers as a full-time desk assistant (December 8,
1997 - June 23, 1998), because Flowers allegedly began working

25

of disparate pay with regard to Flowers.

Plaintiff also argues that she was treated less favorably than Hauck with regard to additional paid vacation time off for both his and her weddings.  It is undisputed that as a condition of his employment, Hauck negotiated with Walker to obtain paid vacation time off for his wedding and honeymoon.  (Johnson decla. ¶ 50; Ellenburg dep. 74-75).  Defendant asserts that the time off Hauck received was not <u>additional</u> time-off but was an advance of Hauck's accrued vacation time which he would earn that year.  (Johnson decla. ¶ 50).  After Hauck returned from his honeymoon, Johnson gave Hauck more days off, without pay, to visit his critically ill father-in-law, whom Hauck feared might die.  Plaintiff asserts that Walker assured her at the beginning of her employment that she could have vacation time off for her own wedding and honeymoon; Plaintiff provides no evidence that such time was to be paid vacation time.  Furthermore, Plaintiff's testimony reveals that Plaintiff is not sure whether or not she <u>was</u> paid for the time she took off for her wedding and honeymoon.

---

part-time hours at some point in time.  Not only has Plaintiff failed to establish by evidence that Flowers did in fact work only part-time hours, Plaintiff has failed to show how these allegations constitute less favorable treatment of a similarly situated employee.

(See Kelley dep. 118, 140, 146).[16]  Plaintiff has provided no
evidence to establish that she was not paid for her
wedding/honeymoon vacation time as Hauck was or to establish that
Hauck's use of his accrued vacation time, as negotiated in
advance, was adverse to Plaintiff.  Thus, Plaintiff has failed to
establish a prima facie case of disparate pay as to Hauck.

Plaintiff alleges that she was denied a raise when she was
allegedly "promoted" to full-time weekday night-side assignment
editor from full-time weekend assignment editor.  Plaintiff has

---

[16]  Plaintiff testified as follows (emphasis added):

A. ". . . I was off for my honeymoon and vacation,
but I don't think I was -- my wedding and my honeymoon,
but I wasn't paid for it.  Stephen Hauck, who came on
board after I did, also [requested] time off for [his]
honeymoon and [his] vacation.  I understand that he was
paid for his wedding and his honeymoon, that time off,
and I was not.
**Q.  You definitely were not paid?**
**A.  I'm pretty sure I wasn't.**  (Kelley dep. 118).
                      * * *
Q.  How do you know he was paid for his time off?
**A.  I don't know he was paid for his time off.**
Someone -- He told someone or somebody told me or --
I'm not sure.  (Id. 140).
                      * * *
A. . . . I don't know for sure if Stephen Hauck
was paid for his vacation for sure or not.  I don't
know -- I mean, I just think that there could have been
some effort, some investigation and therefore some
resolution [into Plaintiff's allegations].  (Id. 146-
47).

not established, or even alleged, a comparator with regard to this claim--a similarly situated white employee whose schedule was changed from weekend assignment editor to weekday night-side assignment editor who did receive a raise.[17]  Plaintiff has provided no evidence of intentional discrimination with regard to this claim, and her prima facie case fails for lack of a comparator.  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Plaintiff also alleges disparate pay with regard to Holley Ford based on the fact that Ford was given an employment contract

---

[17]  The parties dispute whether the schedule change was a "promotion."  Plaintiff's argument that the change was a "promotion" is based upon a personnel file document showing that co-plaintiff Parker was promoted from part-time weekend assignment editor to full-time weekday night-side assignment editor.  Defendant asserts that the record in question reflects a "promotion" because of the status change from part-time to full-time, not the schedule change from weekend to weekday.  (See Personnel/Payroll Change Notice (Parker), D00380 (Sept. 17, 1997)).  The evidence shows that both Plaintiff Kelley and co-plaintiff Parker received raises commensurate with their promotion from part-time to full-time assignment editors (Kelley from $7.00 per hour to $18,000; Parker from $7.00 per hour to $22,000).  (See id.; Personnel/Payroll Change Notice (Kelley), D00131).  Whether the schedule change was in fact a promotion is immaterial, because Plaintiff has failed to establish a comparator and has failed to provide any evidence of intentional discrimination with regard to this claim.

and raise and Plaintiff was not.  Ford held the same job as Plaintiff, full-time assignment editor, at the same time as Plaintiff.  Ford and Plaintiff were both paid $18,000 as the starting salary, set by Walker, for full-time assignment editor. Assuming, without deciding, that Plaintiff made a prima facie case as to Ford, Plaintiff's disparate treatment claim still fails because she has failed to rebut Defendant's legitimate and nondiscriminatory reasons for the decision at issue.  Defendant has asserted and provided evidence that Ford was given a raise and contract because of exceptional performance by Ford, as judged by her supervisor Ehrhart.  Plaintiff does not dispute that Ford deserved a raise and a contract but argues that Plaintiff should have received a raise and contract as well. (Kelley dep. 133-34, 307-08).[18]  Defendants have provided

---

[18]  Plaintiff testified as follows (emphasis added):

Q.  . . . Do you have any knowledge as to what type job security Holly Ford's contract gave her?
A.  No.
Q.  What was it about a contract that seemed appealing to you?
A.  It wasn't so much the contract, it was that she was offered a contract and a raise and I was not.  And I thought that was unfair.
Q.  Okay.  An why was it unfair?
A.  Because I feel like I should have been at least given the opportunity to have a contract.  If I decided not -- I didn't want to sign, that's on me.  But, I should have had that

29

evidence of performance problems as observed by Plaintiff's

superiors, Ehrhart and Johnson (the decisionmakers).  (<u>See</u>

Johnson decla. ¶ 48; Ehrhart decla. ¶¶ 15-18).  Ford's testimony

corroborates these performance problems from Ford's own

observation while working the assignment desk with Plaintiff.

(<u>See</u> Ford decla. p.2).  Plaintiff has provided no evidence to

rebut Defendant's legitimate and nondiscriminatory reasons but

has attempted only to quarrel with Defendant's reasons, which is

clearly insufficient under the law of this Circuit;[19] Plaintiff

---

opportunity, and I should have -- I deserved a raise as well.
**I'm not saying that Holly didn't deserve a contract and/or a
raise, but I know that I did.**  (Kelley dep. 133-34).

* * *

Q.  In terms of your complaint about pay, is Holly Ford the
only person you're comparing yourself to?

A.  Well, **I honestly thought that Holly and myself deserved
a raise.**  I thought that we were both probably underpaid for what
we did in the market that we were in.  And as far as the
discrimination that I felt, I think, yes, compared to Holly Ford.

Q.  I'm just trying to make sure I understand.  In your
claims, she is the only employee that you're comparing it to?

A.  Yes, that I can think of right now.

Q.  She was--She was the person doing the closest thing to
your same job, is that fair to say?

A.  Yes, that's fair to say.

Q.  And there was no one else that did yours and Holly
Ford's job?  Again, we're talking about the time you were there
and Holly Ford was there.

A.  That is correct.  (<u>Id.</u> 307-08).

[19]  Plaintiff argues that "a reasonable jury could conclude
that . . . [Defendant] falsified its reasons for the adverse
personnel action" because there was no written documentation of

must meet Defendant's reasons head-on and rebut each legitimate and nondiscriminatory reason articulated by Defendant.  See Chapman, 229 F.3d at 1024-25, 1030.  Plaintiff has failed to establish her disparate pay claim as to Ford.

Plaintiff attempts to argue pretext based on employment decisions regarding written contracts of employment.  Plaintiff's argument is based on Land deposition testimony, which was as follows:

> A.  Any promise of a contract at Channel 42 would have been discussed with me prior to having it be offered to Mr. Scott.  I met with Mr. Scott when he visited the Station.  There was never any conversation about a contract.  We were not offering contracts to off-camera reporters at that time in the evolution of the format, so I don't understand any conversation about a contract as it relates to Mr. Scott at all.
> Q.  What was the hierarchy at the station at that time that would permit someone to have a contract? What class of employees got contracts?
> [OBJECTION]
> A.  At the time Mr. Scott was hired, the station was in the evolution process that led to relaunch.  We were offering contracts to our on camera people, and I believe, to our producers.  But I know for a fact we were not offering contracts to off-camera reporters at that time -- new hires at that time.

performance problems in Plaintiff's personnel file, because Kelley had never been told she was doing a bad job and had allegedly been told that she was doing a good job.  (Kelley's Br. Opp'n Summ. J. 14; Kelley 127-28).  However, Plaintiff has put forth no evidence to seriously dispute Defendant's argument, which is supported by the evidence, that Johnson and Ehrhart (and Ford) all perceived problems with Plaintiff's work performance.

(Land dep. 359-60).  Plaintiff argues that the giving of
employment contracts to Golden and Risk (off-camera reporters)
and Ford (an assignment editor), who were not "producers or on-
air employees," demonstrates pretext.  Defendant argues that
Land's testimony was with regard to specific questions relating
to a particular time period, the relaunch period, and not as to
Plaintiff Kelley or as to all employment contracts generally.
Defendant has provided evidence that employment decisions
regarding contracts were made on a case-by-case basis for
employees other than "on-air" personnel.  (Johnson decla. ¶ 46;
WIAT's Ans. to Pl.'s Interrog. No. 12).  Plaintiff has provided
no evidence that Defendant's employment decisions regarding
contracts were based upon race.  Furthermore, although Plaintiff
contends that Defendant discriminated against black employees
with regard to employment contracts, Plaintiff has overlooked the
fact that two of her co-plaintiffs, Cassandra Porter (producer)
and Ernie Freeman (anchor) had written employment contracts with
the Station.  Plaintiff has failed to provide sufficient evidence
to demonstrate pretext.

Plaintiff has failed to establish a prima facie case with
regard to her pay for the reasons set forth above and has
provided no evidence that Defendant's employment decisions with

regard to pay were motivated by intentional race discrimination. Plaintiff bears the burden of proof on her disparate treatment claims and has failed to come forward with evidence sufficient to establish her case.  Defendant is therefore entitled to summary judgment in its favor with regard to Plaintiff's disparate pay claims.[20]

## B.  Constructive Discharge

Plaintiff argues that the combination of the Station's history, Plaintiff's own experiences at the Station (discussed above in the analysis of her disparate treatment claims), and the Station's treatment of minority employees while Plaintiff was employed by the Station demonstrates that Plaintiff was subjected to a workplace that was "permeated with discriminatory intimidation, ridicule, and insult" such that Plaintiff was constructively discharged.  (See Kelley's Br. Opp'n Summ. J. 16). Defendant argues that Plaintiff has failed to establish her constructive discharge claim and that the evidence does not

---

[20]    The Court notes that Plaintiff made other allegations in her Complaint and deposition testimony (relating to work assignments, performance evaluations, and lack of interaction with Ehrhart) which she has not pursued in her Brief Opposing Summary Judgment, nor has she provided evidence to establish such claims. Any such claims are therefore waived, and Defendant is entitled to summary judgment in its favor as to all disparate treatment race discrimination claims of Plaintiff.

support such a claim.

The Court finds that Plaintiff has failed to demonstrate by substantial evidence that her work conditions were so intolerable that a reasonable person in her position would have felt compelled to resign.  Plaintiff testified that there were no racial slurs or jokes during her employment with the Station; that nothing was said indicating that race was a conscious consideration in decisions affecting her employment; and that she did not remember feeling intimidated by anyone at the Station. (Kelley dep. 110-12, 309).  She also testified that John Ehrhart, her supervisor of approximately two months, was the only person at the Station who had discriminated against her.  (Kelley dep. 48, 109, 119, 135-36, 142).  Plaintiff first complained of race discrimination two weeks before resigning employment with the Station.[21]  After Plaintiff's complaint, Roberts, Head of Human Resources for Media General, and Mobley conducted an investigation of Plaintiff's race discrimination claims and found that the challenged decisions were based on legitimate business reasons; Roberts followed up with Plaintiff in September of 1998.

---

[21]  See Kilgore v. Thompson & Brock Mgmt, Inc., 93 F.3d 752, 754 (11th Cir. 1996) ("Unless the employer is given sufficient time to remedy the situation, constructive discharge will generally not be found to have occurred.").

Plaintiff testified that she could have changed her mind about

leaving the Station if she had felt that her claims were being

investigated. (Kelley dep. 146, 148-52).[22]  Plaintiff has failed

_____

[22]  Plaintiff testified as follows:

Q.  And your complaint with Media General is after you
complained, the two individuals whom you understood to be from
Media General, they didn't take sufficient action to remedy the
problems you raised?
A.  Yes, basically.
                              * * *
Q.  Well, when you complained to Ms. Mobley and Mr. Roberts,
what did you want them to do?
A.  I thought that there should have at least been some
investigation into my allegations. . . . I just think that there
could have been some effort, some investigation and therefore
some resolution.
                              * * *
Q.  In terms of those issues that you raised, how quickly
did you expect them to address those?
A.  I didn't have a time frame in mind.
Q.  What would have been, in your mind, a reasonable time
frame for them to try to address those?
A.  I'm not sure.
Q.  You have no earthly idea, no thought at all what might
be reasonable?
A.  I'm sure back then, after certain time, I started
thinking, you know, well -- but at this point, I can't -- I don't
know.  I don't remember.  I don't know.  I guess a few weeks.
Q.  If they addressed it within a few weeks, you'd consider
that to be reasonable?
A.  I assume.
                              * * *
Q.  . . . You said by the time you gave notice of your
resignation, you decided it was intolerable and you could not
work there any longer; is that right?
A.  Yes, basically.
Q.  Is there anything that could have been done at that
point to change your mind?

to establish her own disparate treatment claims and has failed to establish personal knowledge of the numerous allegations she has made regarding conduct involving other employees (primarily her six co-plaintiffs).  Plaintiff has failed to establish that her work at the Station was objectively intolerable so as to constitute constructive discharge, Hill v. Winn Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991), and thus Defendant is entitled to summary judgment in its favor as to Plaintiff's constructive discharge claim.

In summary, the Court finds that no material issues of fact

---

A.  I think that something could have been done to change my mind about the type place I worked, change my view about my work environment, and therefore change my mind about leaving, yes.
A.  What types of things could have been done after you gave notice that might have led you to change your mind?
A.  If I--If I felt like my claims are being investigated, pursued, if anybody cared, I think that I would have felt like: Well, if there is not a resolution, at least they're working toward one, and, you know -- but I didn't feel that way.
*  *  *
A.  . . . It was more like [Mobley and Roberts] saying since [Ehrhart]'s no longer here, will you consider coming back?
Q.  What did you say in response to that question?
A.  I didn't say yes or no, as far as I remember, but basically, you know, we could explore some possibilities.
*  *  *
Q.  So [Ehrhart] being gone would not have made the atmosphere more tolerable?
A.  No.  But the company at least willing to look at the problems and resolve them internally I thought was positive. (Kelley dep. 146-52).

remain and that Defendant MG Broadcasting is entitled to judgment as a matter of law as to all Title VII and § 1981 racial discrimination disparate treatment claims and constructive discharge claims asserted against it by Plaintiff Kelley.  A separate order will be entered.

DONE this __11th__ day of June, 2001.

_____

SENIOR UNITED STATES DISTRICT JUDGE