```
         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ALABAMA
                   SOUTHERN DIVISION
```

FILED
01 AUG 28 AM 8:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

MG BROADCASTING OF BIRMINGHAM,    )
INC., d/b/a WIAT-TV,
                                  )
      COUNTERCLAIMANT,
                                  )
VS.                                         CV-99-H-1276-S
                                  )
CASSANDRA L. PORTER,
                                  )
      COUNTER-DEFENDANT.

ENTERED
AUG 2 8 2001

## MEMORANDUM OF DECISION

The remaining matter in this litigation is embodied in the September 6, 2000 motion of Counterclaimant MG Broadcasting of Birmingham, Inc. for summary judgment in its favor with regard to its counterclaim against Cassandra Porter for breach of contract. Pursuant to this Court's Orders entered July 16 and July 24, 2001 (Document Nos. 236 & 238), the motion for summary judgment as to such claims is now under submission. The parties have presented to the Court evidence in support of and in opposition to the motion, as well as briefs addressing the issues now under submission.

### I. Procedural History

On December 12, 2000, the Court granted Defendants' motion for summary judgment as to Porter's claims against Eric S. Land

and against MG Broadcasting for fraud (Count Five) and as to Porter's claims against MG Broadcasting for breach of contract (Count Four). (Document No. 123). The procedural history of this case prior to the December 12, 2000 Order is outlined in detail in the Memorandum of Decision accompanying that Order. (Document No. 122). On May 3, 2001, The Court granted Defendant's motion for summary judgment as to Porter's claims against MG Broadcasting for disparate treatment racial discrimination. (Document No. 203). On June 13, 2001, as amended June 18, 2001, the Court granted Defendant's motion for summary judgment as to the racially hostile work environment claims of Porter and the other six Plaintiffs in this case against MG Broadcasting. (Document Nos. 218 & 220). The Court has entered partial final judgment in favor of Defendants Eric S. Land and MG Broadcasting pursuant to Federal Rule of Civil Procedure 54(b) as to all claims of Plaintiff Porter and the other six Plaintiffs in this case. The only claim remaining in this case is MG Broadcasting's counterclaim against Plaintiff Porter, which is the subject of this memorandum of decision.

**II. Standards for Evaluating a Summary Judgment Motion**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to

2

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1023 (11th Cir. 2000) The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp.</u>, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. <u>Id.</u> at 324.

The substantive law will identify which facts are material and which are irrelevant. <u>Chapman</u>, 229 F.3d at 1023; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. <u>Chapman</u>, 229 F.3d at 1023; <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at

4

trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing

Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[1]

Defendant MG Broadcasting of Birmingham, Inc. owned the assets of WIAT-TV ("the Station") at all times material to this action. On October 20, 1997, Plaintiff accepted employment with WBMG/WIAT as a producer. Plaintiff is a single-parent with one young child.

Plaintiff received a two-year contract of employment when she first reported to work with Defendant. (Porter dep. 232). On November 24, 1997, Plaintiff executed the contract of employment with WBMG/WIAT (hereinafter "WIAT" or the "Station"). The contract stated (1) that "[t]he parties agree that Porter's duties may require that Porter work nights, weekends, holidays and/or fluctuating hours" and that the Station would determine Plaintiff's hours and duties in its discretion[2] and (2) that

---

[1] Additional facts surrounding Plaintiff's employment with the Station are set forth in the Memoranda of Decision accompanying the Court's December 12, 2000 and May 3, 2001 Orders. (See Document Nos. 122 & 202 ) (granting summary judgment in favor of Defendants as to Plaintiff Porter's fraud, breach of contract, and disparate treatment racial discrimination claims). The Court hereby incorporates those facts into this Memorandum of Decision and Order.

[2] The contract stated that "WBMG shall have the power to direct, control and supervise Porter's duties, and the time, location and manner of Porter's performance of those duties

Plaintiff could be terminated immediately without notice if the Station determined in its sole discretion that Plaintiff had deliberately failed or refused to perform her job duties. (Porter dep. 332-33, Def. Exh. 4, Employment Contract, pp. 1-2). The pertinent parts of Plaintiff Porter's employment contract reads as follows:

> III.   EMPLOYMENT TERM/TERMINATION
> 
> * * *
> 
> C.   [WIAT-TV] and Porter agree that, if Porter terminates or refuses to perform services under this Agreement prior to its expiration or [WIAT-TV's] termination of Porter, [WIAT-TV] will incur expenses it would not have otherwise incurred, including expenses in recruiting, hiring, training, and transitioning [WIAT-TV's] operations to other employee.  Therefore, **Porter agrees that, if she terminates or refuses to perform services under this Agreement, Porter will pay [WIAT-TV] as liquidated damages a sum equal to twenty percent (20%) of the sum which would have been received by Porter as annual compensation for the year in which Porter's act occurs**; the sum is hereby agreed by [WIAT-TV] and Porter to be their best estimate of the expenses to be incurred by [WIAT-TV] because of Porter's termination of or failure to perform under this Agreement.
> 
> * * *
> 
> VIII.   ENFORCEMENT
> 
> In the event it should become necessary for [WIAT-TV] to retain the services of an attorney (a) to enforce the terms of this Agreement, or (b) to appear in any proceeding seeking a declaration of the parties'

---

provided, however, that WBMG shall not impose employment duties or restrictions of any kind that would require Porter to violate any law."  (Exh. 4, Employment Contract at V.D.).

7

rights under this Agreement, Porter agrees to pay the costs of any legal proceedings and [WIAT-TV's] reasonable attorneys' fees, including any attorneys' fees and costs incurred by [WIAT-TV] as a result of appellate proceedings (regardless of the party initiating the appeal.)  (Def. Exh. 4, Porter Employment Agreement at 3 -6) (emphasis added).

Porter reviewed the contract prior to executing it.  (Porter dep. 322-23).  As part of the contract, Porter agreed that prior to signing, she had a full and fair opportunity to review the contract carefully with her attorney; that her signature signified her agreement that she signed the contract knowingly, voluntarily, and without duress or coercion; and that she had not relied on any representation or any statement not set forth in the written contract.  (Def. Exh. 4, ¶ IX.).

The contract included a clear and unambiguous merger clause which provided that "[t]he Agreement contains the entire understanding of the parties" and "there are no agreements between [the parties] except as set forth in th[e] Agreement."  The contract also referenced the company's policies and procedures manual. (See Def. Exh. 4, Employment Contract, at ¶¶ III.B.(d), V.B.,G., XI.).  The manual provided that "the contents of this manual **do not constitute the terms of a contract of employment**" and that the contract of employment superceded where there was any conflict between the contract and the manual.

8

(Def. Exh. 9, Policy & Procedure Manual, Introduction & policy E-3). On March 24, 1998, Porter signed an acknowledgment that she had read and fully understood the manual (See Def. Exh. 8).

During her employment with WIAT, Porter initially served as producer of the weekday morning news show and worked a shift from 10:30 p.m. until 7:00 a.m. (Porter dep. 32-33). The morning news program Porter was producing was canceled on December 31, 1997, in anticipation of the Station's format change and relaunch. As a result of the cancellation, Porter was transferred to produce the 5:00 p.m. weekday news program. (Land dep. 302).

On March 1, 1998, Porter called in on Sunday morning stating that she would be in late because she was attending a church function. Porter instructed Kim Kurth, who is not a producer, to begin certain tasks for that evening's news program. According to Defendant, Porter did not come into work until well into her assigned shift on that day. Eric Land, the Station's President and General Manager, believed that Porter did not come into work early enough to carry out her responsibilities for producing the news later that day. (See Johnson decla. ¶ 59; E-mail from Land to Roberts (Mar. 3, 1998), D0536-D0537).

The employment records of Defendant reflect that on April

9

30, 1998, Porter was verbally warned about her failure to come into work on scheduled dates due to inability to report to work as scheduled.³ (Reason for Dismissal Form, D0379; see Land dep. 324; Johnson decla. ¶ 59).

In May 1998, Porter was temporarily assigned to produce the weekend news shows to replace Rhonda Underwood. Porter communicated to Johnson, the Station's News Director and Porter's immediate supervisor, that she did not want the weekend producer's work schedule, that working weekends "may be a problem because of [Porter's] child care situation," and that she preferred producing the 5:00 p.m. weekday news program. (Porter dep. 188-89, 193-95; Porter EEOC Charge (July 21, 1998), D00198). However, Porter was told that she had to work the weekend shift. (Porter letter to file (July 14, 1996)). Johnson told Porter that he was sympathetic to her situation as a single parent and offered assistance in helping her locate weekend childcare.⁴ Porter found a sitter who could work weekends. (Johnson decl. ¶

---

³ Porter disputes that she received prior warning about failing to come to work as scheduled. (See Porter dep. 401).

⁴ Porter testified that when she was assigned to work the weekend shift, Johnson told her she would have to find somebody to keep her daughter, or she would lose her job. (Porter dep. 189).

10

54; Porter dep. 123-24).

From May 1998 until July 1998, Porter's schedule was to work Wednesday through Sunday, and she was assigned to produce two weekend news programs by herself and to co-produce the other two weekend news programs. (Id. ¶ 56).

Porter was aware that she was scheduled to work the weekend of July 3-5, 1998, and she had at least six weeks to secure a babysitter. (Porter dep. 121, 136). When Porter first arranged for a sitter during Porter's weekend shifts (beginning in May of 1998), the sitter informed Porter that she would be unable to keep Porter's daughter on the July 3-5 weekend. (Id. 124). Within the two weeks prior to the July 3-5 weekend, Porter made requests to at least two of her supervisors, Micah Johnson and Ken Pilcher, Weekends Executive Producer/weekend news manager, to be off on July 3, July 4, and July 5 because she did not have a babysitter.[5] Porter contends that she reminded Pilcher on more than one occasion that she did not have a sitter. (Compl. ¶ 26). Pilcher allowed Porter to be off on Friday, July 3, 1998, because Porter's daughter's day care was scheduled to be closed. (Porter

---

[5] Porter states that she met with Pilcher on Wednesday, July 1 and Thursday, July 2, 1998 regarding this request. On both occasions, Pilcher told her that she was expected to work the weekend shift. (Porter EEOC Charge (July 21, 1998)).

11

dep. 131, 140; Land dep. 320-21). Porter offered to come in on her regular off-days, Monday, July 6, and Tuesday, July 7, instead. (Porter dep. 334). Both Pilcher and Johnson instructed Porter that they expected her to be at work on Saturday, July 4 and Sunday, July 5. (Porter dep. 119-21, 131-32, 136-38, 334; WIAT Ans. to Interrog. #3; Porter's Resp. to Def.'s Interrog. #6; Letter from Porter to File (July 14, 1998)). Porter was warned that she could lose her job if she did not come to work as scheduled.⁶ (WIAT Ans. to Interrog. #3; Land dep. 330-32; Johnson decla. ¶ 56; Reason for Dismissal Form (July 7, 1998), D0379). Porter was the only producer scheduled to work on July 4 and July 5. (Johnson decla. ¶ 62).

Porter talked to a girlfriend and called her mother in an effort to locate an alternative sitter. (Porter dep. 128, 154). According to Porter, she knew that everyone else was going to be out of town or working.⁷ (Id. 129). Porter had not been told by

---

⁶ Porter disputes that she was told in advance that she would be terminated for not showing up. (See Def. Exh. 11, Letter from Porter to File (July 14, 1996); Porter dep. 565).

⁷ Porter testified that four girl friends were also working or out of town. She did not contemplate or consider anyone else as a possibility of keeping her child, because she didn't know anyone else who would be optional baby-sitters (she would only consider people whom she associated with on a daily basis as potential babysitters). Porter cannot recall whether she asked

12

Walker, Land, Pilcher, or Johnson not to bring her daughter to work. (Id. 173-74). Prior to the July 4 weekend, Porter had brought her daughter to meetings on four or five occasions and had kept her daughter at the Station for up to an hour and a half. (Id. 140, 170-72). According to Porter, her babysitter would have cost $25 to $40 had she been available to work on July 4 and July 5; leaving her daughter in Mobile on July 3 and returning to pick her up after working July 4 and July 5 would

---

any of the above-named people whether they knew a potential baby-sitter for her daughter for the weekend in question. (Porter dep. 128-29, 132-36). Also, Porter testified that she knew of a hundred and thirty volunteers who kept kids during the services at the church where she was a member. She contacted the church administrator in May of 1998 asking whether the administrator knew of someone to keep Porter's child on weekends; Porter can recall no subsequent conversation with the administrator after May of 1998 and does not recall checking back with the administrator or asking the administrator if she could suggest anybody just for the two days of July 4 and 5. (Porter dep. 147-48). Porter's family in Mobile consisted of her mother, grandmother, aunts and uncles with whom she is close. Porter testified that her mother was working but she is unsure whether her grandmother was in town. She stayed with her aunt, because her mother was working July 5 and 6, but has not alleged that her aunt had to work on the weekend in question. (Id. 152-53). Porter did not contact the child's father to see if he would be available to keep the child on July 4th and 5th. (Id. 145). Porter testified that the child's other grandparents had expressed to Porter in phone conversations a desire to see their grandchild, but Porter did not ask if they could keep the child on the weekend of July 4 and 5. (Id. 166).

have cost around $50.[8]  (Id. 156-57).

On the morning of July 3, Porter called Holley Ford, a co-worker, and instructed Ford to inform Pilcher and Johnson that Porter would not be in to work on July 4 or July 5, because she did not have a sitter. (Johnson decl. ¶ 57). Porter and her child left Birmingham on Friday, July 3 and went to Mobile to visit family; they returned to Birmingham on the afternoon of Tuesday, July 7. (Porter dep. 155-57, 166, 418-20). In Porter's absence, Pilcher came to the Station to produce the weekend news programs that were Porter's responsibility. (Johnson decl. ¶ 57).

Porter's employment was terminated when she returned to Birmingham on July 7, 1998.[9] Porter received a phone call at home that Johnson wanted to speak with her,[10] and she met with

---

[8] Porter's family in Mobile had kept Porter's child on prior occasions when Porter had to work and needed child care.

[9] The termination decision was made by Johnson and Land in conjunction with Rick Roberts and Debbie Mobley (MG Corporate). (WIAT's Resp. to Pl.'s Interrog. #4; Land dep. 328). According to Land, even if the Station had not terminated Porter for missing work on July 4 and July 5, it would have terminated her if it had known that she left Birmingham on July 3, 1998 to travel to Mobile to visit family and did not return until after the holiday weekend. (Land decl. ¶ 9).

[10] Porter was aware that her trip to Mobile, and failure to work her assigned shifts on Saturday and Sunday, might have jeopardized her employment, because she testified that she hoped she had a job when she returned (Porter dep. 568) and that, with

14

Johnson on the afternoon of July 7, at which time she learned that her employment was to be terminated as of that date for failing to come to work on July 4 and July 5 as scheduled. (Compl. ¶ 26).  Present at the termination meeting were Porter, Porter's child, Land, Johnson, and Ellenburg, Human Resources Coordinator.

On July 8, 1998, Porter signed a "Reason for Dismissal" form which stated that Porter's "<u>failure to work her assigned shift is in direct violation of her employment contract</u>" and that Porter "deliberately failed or refused to perform [her] job duties." (<u>See</u> Exh. 1) (emphasis added).  Above the signature line, the form stated that the employee (Porter) should sign the form at the time of the dismissal interview if she "agrees with the statement of facts (subject to the remarks, if any set forth below the employee's signature)."  Porter signed the form and made no remarks on the form. (<u>Id.</u>).  Porter testified that she

---

regard to the meeting on Tuesday, July 7, she had "a pretty good feeling" before the meeting "that it had something to do with [her] not coming in."
  A.  I was praying that it wouldn't be that I would
  get fired, but maybe I'd be written up or something
  like that, maybe suspended. . . ."
  Q.  But it crossed your mind that you may be
  getting fired?
  A.  Yes sir.
(Porter dep. 398, 420).

15

read the form at the time she signed it. (Porter dep. 568).

One week after signing the form, Porter submitted a letter to her personnel file stating that she had not fully understood the form at the time of her termination and that she now disagreed with the statement of facts. (Exh. 11, Letter from Porter to File (July 14, 1998)).

### IV. Applicable Substantive Law and Analysis

Counterclaimant MG Broadcasting claims that Porter breached her employment contract with WIAT-TV, without justification, by refusing to report to work as scheduled on July 4, 1998 and July 5, 1998 despite repeated directives to do so. MG Broadcasting contends that Plaintiff cannot prove Defendant failed to perform any specific provision of her employment contract. MG Broadcasting therefore argues that it is entitled to summary judgment as to its counterclaim against Porter and to an award of damages equal to $5,400.00, twenty percent (20%) of Porter's annual salary in 1998 (20% of $27,000) plus reasonable attorneys' fees and costs.

A breach of contract is defined as a "failure, without legal excuse, to perform any promise which forms the whole or part of a contract." In order to establish a breach of contract, MG Broadcasting must demonstrate: "(1) the existence of a valid

16

contract binding the parties in the action, (2) [its] own performance under the contract, (3) [Porter]'s nonperformance, and (4) damages." Mann v. Bank of Tallassee, 694 So. 2d 1375, 1380 (Ala. Civ. App. 1996) (citations omitted).

 The law of the case with regard to Plaintiff's breach of her employment contract has been established by this Court's December 12, 2000 Memorandum of Decision and Order (Document Nos. 122 & 123) in which the Court granted summary judgment in favor of Defendants MG Broadcasting and Eric S. Land on Porter's breach of contract and fraud claims and entered partial final judgment on those claims pursuant to Rule 54(b). That decision has now become final, as the time for filing an appeal has passed and Porter did not appeal the December 12, 2000 decision. See Porter v. MG Broadcasting, Inc., No. CV99-H-1276-S, at 26-30 (Dec. 12, 2000) (Memorandum of Decision & Order); Royal Insur. Co. v. Latin Am. Aviation Servs., 210 F.3d 1348, 1350 (11th Cir. 2000) (law of the case doctrine); United States v. Escobar-Urrego, 110 F.3d 1556, 1560 (11th Cir. 1997).

 In its December 12, 2000 Memorandum of Decision, the Court found that the valid employment contract between Porter and WIAT-TV controls the parties' rights in this case and found no breach of the employment contract by Defendant MG Broadcasting. (See

17

Porter, No. CV99-H-1276-S, at 26-30 (Memorandum of Decision)). The Court found that "the evidence shows that plaintiff's employment was terminated when she 'deliberately failed or refused to perform [her] job duties' and that she [was absent from work without permission after she] had been specifically instructed to report to work on July 4 and July 5." (Id. at 28-29). The Court concluded that Plaintiff "has not demonstrated that she performed in compliance with her employment contract." (Id. at 29).

Porter failed or refused to report to work on July 4, 1998 and July 5, 1998, after being given several advance directives to do so by her supervisors. Porter knew at least six weeks in advance that she was scheduled to work on July 4th and 5th, yet she did not secure a babysitter for her young child. The evidence does not show that Porter had no alternative other than to leave her child at home alone, unattended, while she reported to work. Porter made repeated requests to have July 4 and 5 off from work, and her requests were denied. After calling a co-worker to report that she would not be in on July 4 and 5, she and her child left Birmingham on Friday, July 3, 1998 and drove to Mobile to visit family where they stayed until Tuesday, July 7, 1998. (See id. at 27-29).

18

Plaintiff does not dispute that she was absent from work without permission nor that she was physically able to report to work on July 4 and 5. Plaintiff signed, without making any remarks, a Dismissal Form which stated that her failure to work her assigned shift, in direct violation of her contract, was the reason for her dismissal. (See id.). Porter's argument that MG Broadcasting is estopped from enforcing the liquidated damage provision of her contract of employment is without merit. The fact that MG Broadcasting did not enforce such a provision in the contracts of John Ehrhart, Ashley Risk and John Mecham, all of whom voluntarily terminated their employment, cannot support an estoppel defense by Porter, who was involuntarily terminated for failure to work her assigned shift in direct violation of her contract. The argument also would not have had merit had those three also been involuntarily terminated like Porter.

As to damages, the Court finds that Counterclaimant MG Broadcasting is entitled to the $5,400.00 of liquidated damages pursuant to the employment contract between Porter and WIAT-TV. However, MG Broadcasting is not entitled to attorneys' fees and costs. The cut-off date for submission of evidence has passed, and there is no evidence to support MG Broadcasting's claim for attorneys' fees and expenses with regard to its breach of

19

contract counterclaim. Specifically, there is nothing from which the Court can determine the hours devoted to the counterclaim or a reasonable hourly charge for the attorney who worked such hours. Further, the Court has nothing to support a claim for expenses. Thus, the Court has before it no evidence from which to determine "reasonable attorneys' fees and costs," and MG Broadcasting's request for such is therefore denied.

In summary, the Court finds that no material issues of fact remain and that Counterclaimant MG Broadcasting is entitled to judgment as a matter of law as to its breach of contract counterclaim against Cassandra Porter. A separate final order will be entered.

DONE this 28th day of August, 2001.

_____
SENIOR UNITED STATES DISTRICT JUDGE